**UNITED STATES of America**

v.

**Horace MOSLEY.**

**Crim. A. No. 1:92–CR–036–JTC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 11, 1992.

---

James Edward Fagan, Jr., Office of U.S. Atty., Atlanta, GA, for U.S.

Suzanne Hashimi, Fed. Defender Program, Atlanta, GA, for defendant.

## ORDER

CAMP, District Judge.

The Court has before it a Report and Recommendation [# 23–1] by Magistrate Judge Joel M. Feldman; Defendant's Motion [# 18–1] to Adopt his Brief in Support of his Motion [# 8–1] to declare unconstitutional certain United States sentencing guidelines; and Defendant's Motion [# 26–1] to supplement the record. The Court will also consider Defendant's Motion [# 27–1] to Adopt his Objections to the Report and Recommendation.

After a careful, *de novo* review, the Court finds that it agrees with Magistrate Judge Feldman's conclusions. Accordingly, it ADOPTS his Report and Recommendation [# 23–1] as its opinion, and DENIES defendant's motion [# 8–1] to declare the sentencing guidelines unconstitutional. The Court GRANTS defendant's motion [# 18–1] to allow defendant to adopt a brief submitted in another case dealing with the constitutional issues presented here, and GRANTS defendant's motion [# 27–1] to adopt objections submitted in another case to Magistrate Judge Feldman's Report and Recommendation. As none of these objections change the result of the magistrate's decision, the Court OVERRULES them.

Defendant has also asked to add to the record a statement made by a co-defendant, James Kendall. Defendant asserts that this statement tends to incriminate him, so that his attorney had a conflict of interest. As the Court invited defendant to provide proof of this statement, the Court

GRANTS defendant's motion [# 26–1] to supplement the record.

SO ORDERED, this 10th day of Dec., 1992.

## REPORT AND RECOMMENDATION

FELDMAN, United States Magistrate Judge.

PART ONE

### HISTORY OF THE CASES

In each of the above cases the defendants raise constitutional challenges to the punishments and sentence guidelines mandated for criminal offenses involving cocaine base, to-wit: 21 U.S.C. § 841(b) and U.S.S.G. § 2D1.1(a)(3). Specifically, they contend that Congress and the Sentencing Commission had no rational basis to fix the punishment for cocaine base offenses substantially higher than similar offenses involving other forms of cocaine (i.e., cocaine powder, or cocaine hydrochloride);[1] and that, as a consequence the same violates the Due Process Clause of the Fifth Amendment.

■ They further contend that the statute violates the equal protection component[2] of the Due Process Clause of the Fifth Amendment because it adversely impacts on non-whites.

1. The statute provides that the penalty for violations involving five kilograms of cocaine, other than cocaine base, is the same as the punishment for a violation involving 50 grams of a substance containing cocaine base. *See* 21 U.S.C. § 841(b)(1)(A)(ii) and (iii). This is referred to as the 100 to 1 ratio, and the minimum punishment is ten years imprisonment.

   A similar disparity exists as to lesser amounts: 500 grams of cocaine other than cocaine base and 5 grams of ·cocaine base provide a minimum punishment of 5 years imprisonment. *See* 21 U.S.C. § 841(b)(1)(B)(ii) and (iii).

2. The Equal Protection Clause of the Fourteenth Amendment is made applicable to federal statutes under the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *United States v. Iron Shell,* 633 F.2d 77, 89 fn. 17 (8th Cir.1980), *cert. den.,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). *See also United States v. Solomon,* 848 F.2d 156, 157 (11th Cir.1988); *United States v. Holmes,* 838 F.2d 1175, 1177 (11th Cir.1988), *cert. den.,* 486 U.S. 1058, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988).

They further contend that the statute violates the Due Process Clause because it is unconstitutionally vague (i.e., the statute's failure to define "cocaine base").

They finally contend that the foregoing minimum punishment violates the Eighth Amendment as it is grossly disproportionate to the offense when compared to similar offenses involving cocaine hydrochloride.

On April 15, 1992, this Court conducted an evidentiary hearing to consider the allegations. It received testimony from Michael Hutcheson, an investigator with the Public Defender's office; Dr. Martin M. Shapiro, Ph.D., an expert in, *inter alia,* Statistics; Dr. George Robert Schwartz, M.D., an expert in *inter alia,* Medicine, Chemistry, and Toxicology; Drug Enforcement Administration· Assistant Special Agent in Charge of the Atlanta Field Office (ASAC) Joseph Sullivan; and Assistant United States Attorney, N.D.Ga., Janet King. The transcript of their testimony will be referred to hereafter as "Tr." This Court also received a number of documentary exhibits, both at the hearing and with pleadings.[3] Based thereon, this Court makes the Findings of Fact and Conclusions of Law that follow. ·

3. The defendants have moved to supplement the record so as to show that fifteen states make no distinction in their penalties between cocaine base and other cocaine. They also seek. to show, by various magazine articles, that cocaine base constitutes no greater dangerous health problem than cocaine powder.

  · ` The Government has also attached exhibits to its pleadings, including the affidavit of forensic chemist Katherine T. Churchill, identified as exhibit B to the Government's Reply Brief filed October 30, 1992. Additional exhibits to the brief include various magazine articles. Although the Churchill affidavit has not been offered into evidence, it will, nevertheless, be considered for the limited purpose of considering whether the scientific community has attempted to ascertain whether crack cocaine is more dangerous to users than powder cocaine. *See* F.R.E. 104(a) and 201. The Government could have offered such "evidence" at the evidentiary hearing and chose not to do so.

PART TWO

## THE ISSUES

A. IS THE PUNISHMENT FOR COCAINE BASE CONSTITUTIONAL;

   (i) DID CONGRESS HAVE A RATIONAL BASIS FOR FIXING THE PUNISHMENT SUBSTANTIALLY HIGHER FOR OFFENSES INVOLVING COCAINE BASE THAN FOR SIMILAR OFFENSES INVOLVING OTHER FORMS OF COCAINE;

   (ii) IS THE PUNISHMENT FOR COCAINE BASE OFFENSES CRUEL AND UNUSUAL BECAUSE IT IS GROSSLY DISPROPORTIONATE TO SIMILAR OFFENSES INVOLVING OTHER FORMS OF COCAINE;

B. IS THE STATUTE UNCONSTITUTIONAL BECAUSE IT HAS A DISPROPORTIONAL IMPACT ON BLACKS AND OTHER NONWHITES; AND

C. IS THE STATUTE UNCONSTITUTIONALLY VAGUE BECAUSE IT FAILS TO DEFINE COCAINE BASE.

PART THREE

## FINDINGS OF FACT

1. At the time Congress enacted the Anti– Drug Abuse Act of 1986 (21 U.S.C. § 841 et seq.), it had been presented with evidence from expert witnesses showing, *inter alia:*

   a. the use of cocaine by young persons had been increasing dramatically;

   b. one of the reasons for such use was the conversion of cocaine hydrochloride into cocaine base which resulted in:

     (i) convenient packaging;

     (ii) a substantially reduced cost per package (i.e., approximately $10.00 per unit rather than $100.00 per unit for cocaine hydrochloride); and

     (iii) ease of use.

   c. persons operating crack houses were utilizing the services of young persons as guards, lookouts, and street distributors;

   d. hospital admissions which implicated cocaine use had increased substantially as had fatalities from such use;

   e. cocaine base was very simple to use via smoking (intrapulmonary);

   f. unlike snorting (intranasal administration of) cocaine hydrochloride, smoking cocaine base had virtually no physiological restrictions on users;

   g. smoking cocaine base created a faster euphoria and a corresponding faster let down;

   h. although intravenous injections of powder cocaine created a similar high, very few users chose this method of ingestion;

   i. because of the rapid "high" obtained from smoking cocaine base, users tended to seek additional units very rapidly;

   j. there was insufficient evidence to conclude that either cocaine powder or cocaine base use resulted in "addiction" as that term is understood scientifically;

   k. studies of cocaine base abuse by smoking in two countries (the Bahamas and Peru) showed a substantial increase in significant health problems, including psychiatric hospital admissions.

2. The defendants presented evidence through Dr. Schwartz and documentary exhibits which tended to contradict the evidence presented to Congress, including:

   a. Cocaine base was not more dangerous than cocaine hydrochloride, as most fatalities traceable to cocaine use probably involved cocaine hydrochloride.[4]  Tr. 84–85, 89, 92, 93, 101, 104, 112, 148, 151.

   b. Cocaine use was declining.[5]

---

**4.** Apparently, the tragic deaths of two celebrated athletes were caused by the use of cocaine hydrochloride, not cocaine base as alleged.  Tr. 90–91.  *See also* fn. 5, *infra.*

**5.** *See* John A. Rich and Daniel E. Singer, *Cocaine–Related Symptoms in Patients Presented to Urban Emergency Departments,* Annals of Emergency Medicine, June 1991, pp. 38–42; Craig Reinarinan and Harry G. Levine, *Crack in Con*

c. There was no scientifically reliable evidence that cocaine base was more addictive than cocaine hydrochloride. Tr. 86, 89, 101, 105, 106, 124, 129, 134, 150.

d. Cocaine base does not cause users to commit more violent crimes than other drug abusers. Tr. 87, 108, 109.

e. A substantial number of states make no distinction in punishment between cocaine base and cocaine hydrochloride.[6] Indeed, only the United States and the States of California, Maryland, Oklahoma, South Carolina and Wisconsin punish cocaine base offenses more severely than similar cocaine hydrochloride offenses.

PART FOUR

## CONCLUSIONS OF LAW

A. THE PUNISHMENT FOR A CO-CAINE BASE OFFENSE IS NOT UN-CONSTITUTIONAL:

(i) CONGRESS HAD A RATIONAL BASIS IN FIXING THE PUNISH-MENT FOR COCAINE BASE OF-FENSES.

■ The defendants raise several constitutional challenges to the punishments authorized for cocaine base offenses. First, they contend that Congress had no rational basis[7] on which to differentiate between the two offenses. They contend secondly that the punishment is disproportionate to similar offenses involving other forms of cocaine (i.e., cocaine hydrochloride, a/k/a powder). Although the Eleventh Circuit has now ruled[8] that the statutory penalty and guidelines authorized for cocaine base offenses is constitutional (i.e., that Congress and the Sentencing Commission had a rational basis on which to differentiate between the nature of the cocaine involved) and that the punishment for cocaine base offenses is not cruel and unusual, this Court will, nevertheless, endeavor to explain such conclusion in light of the evidence presented before the undersigned.

At the onset it must be acknowledged that the "[p]ossession, use, and distribution of illegal drugs represents one of the greatest problems affecting the health and welfare of our population." *National Treasury Employees v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989), as quoted in the concurring opinion of Kennedy, J., in *Harmelin v. Michigan*, — U.S. —, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). *See also United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring in part and concurring in the judgment). In addition to the "pernicious effects on the individual who consumes illegal drugs," the drugs also generate substantial additional criminal acts in numerous ways: (1) drug users may commit crimes because of drug-induced changes in physiological functions, cognitive ability and mood; (2) drug users may commit additional crimes[9] in order to ob-

---

*text: Politics and Media in the Making of a Drug Scare,* Contemporary Drug Problems, Winter 1989, pp. 535–577 (Exhibits 1 and 2 to Defendant Willis' Supplementation of the Record, filed May 28, 1992 and Defendant Willis' Supplemental Brief, field August 27, 1992); Henry W.B. Smith, etc., *Acute Myocardial Infarction Temporarily Related to Cocaine Use,* Annals of Internal Medicine, July 1987, pp. 13–18; Velvie A. Pogue, etc., *Cocaine–Associated Acute Myoglobinuric Renal Failure,* American Journal of Medicine, Feb. 1989, pp. 1983–186; Warren A. Kossowsky, etc., *Cocaine and Acute Myocardial Infarction,* Chest, Nov. 1987, pp. 729–734; Daniel Lowenstein, etc., *Acute Neurologic and Psychiatric Complications Associated with Cocaine Abuse,* American Journal of Medicine, Nov. 1987, pp. 841–846 (exhibits to Defendant Willis' Supplemental Brief, filed August 27, 1992).

6. *See* defendant Willis' First Supplementation of the Record, filed May 27, 1992; Defendant Hall's Motion to Supplement the Record, filed June 8, 1992.

7. On its face the statute does not discriminate against a suspect class. Consequently, the statute will be sustained if Congress had a rational basis for creating the several classifications. *United States v. Osburn,* 955 F.2d 1500, 1505 (11th Cir.1992); *United States v. Holmes, id.*

8. *See United States v. King,* 972 F.2d 1259 (11th Cir.1992); *United States v. Lawrence,* 972 F.2d 1580 (11th Cir.1992).

9. Such crimes include, but are not limited to, the murder and attempted murder of judges, prosecutors, law enforcement officers, rivals, competitors, underlings and innocent civilians,

tain money to purchase additional drugs to feed their need for drugs; and (3) violent crimes may occur as a part of the drug business or culture.[10] *Harmelin v. Michigan,* ―― U.S. at ――, 111 S.Ct. at 2706, 115 L.Ed.2d at 870 (concurring opinion of Kennedy, J.).

It is, therefore, fitting and proper that the legislature seek to deter such acts by raising the ante for those who seek to inflict this cancer on our population. As previously noted, it is precisely such a legislative attempt which is brought in question here—the enactment of the Anti–Drug Abuse Act in 1986 (21 U.S.C. § 841 et seq.).

Furthermore, while these defendants have attempted to isolate two provisions of the Act (i.e., the punishment for cocaine base and the punishment for cocaine powder) as have others,[11] it is necessary to evaluate the entire statutory scheme involved not mere portions thereof in isolation.[12]

## HISTORY OF THE LEGISLATION

Commencing in 1982, various members of Congress attempted to increase the penalties for aggravated violations of the federal drug laws. Of particular concern were attempts to target drug traffickers for severe punishment. *See* House Report 99–845, to accompany H.R. 5394, pp. 10–11 (Gov.Ex. A to Government's Brief of Supplemental Authorities, filed June 26, 1992).

In 1985 and 1986, members of the House of Representatives introduced ten separate bills to attack the proliferating cancer of drug crimes which threatens to overwhelm this nation's citizens. In conjunction therewith, the House Judiciary Committee's Subcommittee On Crime conducted four days of hearings to consider the nature and patterns of drug trafficking and appropriate sentences for violations of the Controlled Substances Act (21 U.S.C. § 801 et seq.) and the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.).

Based thereon, the subcommittee reported out a comprehensive bill, HR 5394, the Narcotics Penalties and Enforcement Act of 1986. Insofar as relevant here, the bill provided that violations involving five kilograms of cocaine substances other than "cocaine freebase", and offenses involving 100 grams of cocaine freebase, carried penalties of not less than ten years imprisonment for first-time offenders. Violations involving lesser amounts (i.e., one kilogram of substances involving cocaine other than cocaine freebase, and 20 grams of cocaine freebase) imposed minimum sentences of five years imprisonment for first offenders. *Id.*

These quantities were arrived at on the basis of testimony and exhibits obtained from DEA investigators and prosecutors to the effect that the possession of such quantities would identify the possessor as a

---

and the bribery and corruption of judges, prosecutors and law enforcement officers. Indeed, the actions of the Columbian Drug Cartels in assassinating Columbian judges, prosecutors, law enforcement officers and members of the military are so well known that further elaboration is not required. *See* F.R.E. 201.

**10.** These include, but are not limited to, murders, armed and unarmed robberies, burglaries and thefts. *See* F.R.E. 201.

**11.** *See United States v. Osburn, id.* (distinction between punishment for marijuana offenses involving more than 50 marijuana plants and for similar offenses involving less than 50 marijuana plants, and bulk marijuana). *Accord United States v. Bradley,* 905 F.2d 359 (11th Cir.1990); *United States v. Motz,* 936 F.2d 1021 (9th Cir. 1991). *See also United States v. Bishop,* 894 F.2d 981 (8th Cir.1990) (LSD).

**12.** It is also clear that Congress adopted additional statutes attacking, *inter alia,* drug traffickers by providing additional penalties for persons over eighteen who distribute controlled substances to persons under eighteen (21 U.S.C. § 845b) and within 1000 feet of schools and colleges (21 U.S.C. § 845a), and who employ persons under eighteen years old (21 U.S.C. § 845b). See subtitle C, 100 Stat. 3207 (10–11). The act also included under subtitle H, Additional crimes and penalties for money laundering by and for drug traffickers: Additional enacted statutes provided for the forfeiture of assets acquired with illegal drug proceeds and for those used to facilitate drug offenses (18 U.S.C. §§ 981 and 982), and penalties for laundering drug proceeds (18 U.S.C. § 1956). Indeed, the act even authorized a $500,000 reward for information leading to the apprehension of Luis Ochoa Vasquez, alleged leader of one of the Columbian Drug Cartels. *See* § 2014(d), 100 Stat. 3207 (67–68).

major or lesser drug trafficker, thereby targeting the nature of the offense and its relative seriousness.

Concomitant therewith, members of the Senate also introduced legislation to attack, *inter alia*, the crack cocaine epidemic, including S–2716, introduced August 5, 1986. 132 Cong.Rec. pp. 19240–19250, 21964–21905. Gov.Ex. B., *id.*

In connection therewith, the Senate Government Operations Committee's Permanent Subcommittee On Investigations conducted evidentiary hearings in July 1986, to consider the scourge of "crack" cocaine abuse. At the hearing, the Committee received testimony from Dr. Charles R. Schuster, Ph.D., Director, National Institute on Drug Abuse; Dr. Robert Byck, M.D, Yale University School of Medicine, Professor of Psychiatry and Pharmacology; David Westrate, Assistant Administrator for Operation, Drug Enforcement Administration; several law enforcement officers; and former crack house employees and users. Gov.Ex. C.

Dr. Schuster testified that in the past fifteen years cocaine abuse had grown from a minor problem to a major public health problem; and that, commencing in 1985, crack cocaine (which he defined) had become of even greater concern because of its easy availability (lower unit cost), packaging, and ease of ingestion, all of which resulted in, *inter alia*, its increased use among young people and children.

Likewise, Dr. Byck testified that smoked cocaine (i.e., cocaine base, a/k/a crack) created, *inter alia*, substantial mental health problems, not readily amenable to treatment. He, too, defined cocaine freebase. He further identified significant health problems in the Bahamas and in Peru attributable to increased use of cocaine base by smoking. He also testified that there was little evidence available indicating whether cocaine or crack were addictive as that term is understood in the scientific community.

In enacting the legislation, Congress decided to select a market approach to attack the problem—to seek to identify major drug traffickers and smugglers, and to punish them commensurate with the seriousness of their conduct. For this same reason Congress also targeted for increased punishment second level drug traffickers and smugglers. It sought, therefore, to obtain information indicating the minimum quantity of *inter alia*, heroin, cocaine powder, cocaine base, PCP, LSD, methamphetamine and marijuana that might be controlled by a major and second level drug trafficker. *See* House Committee Report 99–845, to accompany H.R. 5394, p. 12 (Gov.Ex. A, Government's Supplemental Points of Authority, hereafter Supplemental Brief filed June 26, 1992).

It may be argued that the evidence suggests (1) cocaine base is not, in fact, one hundred times more dangerous than cocaine hydrochloride powder, or even as dangerous as powder, (2) that there is very little difference between the addictive qualities of either, (3) that all forms of cocaine use are declining, (4) that cocaine base users do not commit more violent acts than other drug abusers, (5) that cocaine powder can also be taken intrapulmonarily (i.e., smoked) and (6) that most jurisdictions do not distinguish between cocaine powder and cocaine base for punishment purposes.

Such is not, however, the test by which a Court must gauge whether congressional action in enacting the statute was supported by a rational basis. In short, this Court is not authorized to go behind and reweigh the evidence utilized by Congress to support its actions. *United States v. Osburn, id. Compare Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981); *United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938).

Furthermore, it is clear that all persons who traffick[13] in large quantities of illegal drugs including, *inter alia*, heroin,

---

**13.** For our purposes, traffickers include persons who smuggle such amounts of the enumerated drugs into and out of this country.

cocaine powder, cocaine base, PCP, LSD, methamphetamine, and marijuana, constitute significant dangers to the public. For Congress to utilize a market approach to punish these traffickers on the basis of the level at which they operate is, therefore, a rational basis, and passes Constitutional muster. It is the seriousness of the danger to the community, not the interaction between the several kinds and quantities of illegal drugs, which determines the severity of the punishment.[14] All major traffickers of the several kinds of drugs, including cocaine base and cocaine powder, face the identical punishment; all lesser traffickers of the same drugs face identical lesser minimum punishment; and offenses involving still lesser quantities of the several drugs do not contain minimum sentences for first offenders, and, as to marijuana, a lesser penalty.

It is also clear that the evidence establishes that the unit cost of cocaine base (i.e., $10.00) and its packaging has substantially contributed to its use by young persons and children, which fact constitutes a sufficient rational basis to fix the foregoing punishment without regard to other factors. Indeed, every federal appellate court considering the issue has reached this same conclusion. *United States v. Williams*, 876 F.2d 1521, 1525 (11th Cir. 1989); *United States v. Robinson*, 870 F.2d 612, 613 (11th Cir.1989) as quoted in *United States v. Catchings*, 922 F.2d 777, 780, fn. 3 (11th Cir.1991); *United States v. Solomon*, 848 F.2d at 157; *United States v. Holmes*, 838 F.2d at 1177; *United States v. Thomas*, 900 F.2d 37, 39 (4th Cir.1990); *United States v. Watson*, 953 F.2d 895, 898 (5th Cir.1992), *cert. den.*, — U.S. —, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992); *United States v. Galloway*, 951 F.2d 64 (5th Cir. 1992); *United States v. Pickett*, 941 F.2d 411 (6th Cir.1991); *United States v. Lawrence*, 951 F.2d 751 (7th Cir.1991); *United States v. Willis*, 967 F.2d 1220, 1225 (8th Cir.1992) (but see concurring opinion); *United States v. Lattimore*, 974 F.2d 971 (8th Cir.1992); *United States v. House*, 939 F.2d 659, 664 (8th Cir.1991); *United States v. Buckner*, 894 F.2d 975, 979 (8th Cir. 1990); *United States v. Harding*, 971 F.2d 410 (9th Cir.1992); *United States v. Malone*, 886 F.2d 1162, 1166 (9th Cir.1989); *United States v. Turner*, 928 F.2d 956 (10th Cir.1991); *United States v. Cyrus*, 890 F.2d 1245, 1208 (D.C.Cir.1989).

It is also clear that the sentencing guidelines which utilize these same statutory criteria are rationally based. *United States v. Osburn, id.; United States v. Lawrence, id.*

Thus, this constitutional attack on the statute and the guidelines must fail.

### (ii) THE PUNISHMENT FOR COCAINE BASE OFFENSES DOES NOT CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT WITHIN THE MEANING OF THE EIGHTH AMENDMENT.

■ The defendants also contend that the punishment for cocaine base offenses constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. In support thereof, they rely on evidence that suggests that cocaine base is no more dangerous than cocaine powder; and that, as a consequence, the 100 to 1 ratio is disproportionate to the offense: that cocaine base offenses should be punished no more severely than similar cocaine powder offenses.

As noted above, Congress had a rational basis when it set the penalty for cocaine base offenses. It is also clear that such punishment does not offend the Eighth Amendment's proscription against cruel and unusual punishment. *See* fn. 14, *supra*. *See also United States v. Solomon*, 848 F.2d at 157. Other federal appellate courts considering the issue have reached the same conclusion. *United States v.*

---

**14.** The true question then is: does a punishment of, *inter alia*, not less than ten years nor more than life imprisonment plus a fine of not more than $4,000,000 for one convicted of, *inter alia*, distributing, or possessing with intent to distribute, at least five kilograms of cocaine powder or at least 50 grams of cocaine base constitute cruel and unusual punishment which is prohibited by the Eighth Amendment? This Court is compelled to conclude that it does not. *Harmelin v. Michigan, id.*

*Thomas*, 900 F.2d at 39; *United States v. Pickett*, 941 F.2d 411 (6th Cir.1991); *United States v. Buckner, id.; United States v. Malone, id.; United States v. Savinovich*, 845 F.2d 834, 839 (9th Cir.1988); *United States v. Colbert*, 894 F.2d 373 (10th Cir. 1990), *cert. den.*, 496 U.S. 911, 110 S.Ct. 2601, 110 L.Ed.2d 281 (1990); *United States v. Cyrus, id.*

B. THE INCREASED SENTENCES AUTHORIZED FOR DRUG VIOLATIONS INVOLVING COCAINE BASE, BY THE STATUTE AND BY THE GUIDELINES, DOES NOT VIOLATE THE DEFENDANTS' RIGHTS TO EQUAL PROTECTION OF THE LAW.[15]

■ The defendants make two arguments with respect to the enactment of the statute, and the guidelines promulgated to implement it. First, they contend that the statute and guidelines are unconstitutional because they have a disparate impact on non-white (i.e., black and hispanic) defendants. Second, they contend that the statute and guidelines violate the Equal Protection Clause by the failure of Congress and the Sentencing Commissions to repeal the penalty clause after learning of its disparate impact on non-whites.[16]

■ In order to carry his burden a defendant must prove "the existence of purposeful discrimination ..." and that such purposeful discrimination "had a discriminatory effect on him." *McCleskey v. Kemp*, 481 U.S. 279, 298, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262, 282 (1987). He must, therefore, prove that the Congress and the

Sentencing Commission (i.e., the decision-makers) "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group."

■ A defendant would have to prove that the Congress and the Sentencing Commission "enacted or maintained the ... [cocaine base] statute *because of* an anticipated racially discriminatory effect" (*id*): That Congress (and the Sentencing Commission) enacted the statute and guidelines for the specific purpose of punishing non-white defendants who commit drug offenses involving cocaine base more severely than whites who commit similar drug offenses involving cocaine other than cocaine base.[17]

.In order to sustain their burden, the defendants have introduced statistical evidence showing that virtually all of those persons indicted for cocaine base offenses in this district are black.[18] They then ask this Court to assume this disparity exists nationally, and that Congress was either aware of this disparate impact at the time the statute was enacted, or, after enacting the statute learned of the disparity, and failed to amend or repeal it.

Unfortunately for the defendants, they have failed to present any evidence to show that either Congress or the Sentencing Commission intended to discriminate against non-whites in enacting the cocaine base punishment statute and guidelines, or that Congress and the Sentencing Commission knew that virtually all users of cocaine

---

15. As previously noted, the Equal Protection Clause of the Fourteenth Amendment, applicable to the states, has been engrafted into the Due Process Clause of the Fifth Amendment. *See* fn. 2. Consequently, it is applicable to these federal defendants.

16. As previously noted, this Court is compelled to conclude that the punishments authorized do not violate the Eighth Amendment.

17. Indeed, the foregoing statistical evidence also establishes that blacks also commit offenses involving cocaine powder.

18. Although the defendants sought to obtain evidence of such disparity beyond the Northern

District of Georgia, they were thwarted by this Court's Order limiting their discovery to this District, and the Government's Motion to Quash their subpoena for additional evidence on other areas. For the purpose of this opinion, this Court will, nevertheless, assume that the same disparity exists in other districts. *Compare United States v. King*, 972 .F.2d at 1260, fn. 1.

Indeed, as to defendant *Willis*, the District Judge rejected the Government's appeal of this Court's Order; and the Government has now examined its files and shows that the DEA lab processed 156 crack cocaine exhibits from this district. The alleged violators noted were 115 blacks, 18 caucasians, and one hispanic. *See* exhibit 2 to the Government's October 30, 1992 brief.

base are black. Indeed, the testimony referred to in the Committee reports and the other evidence is devoid of evidence of such a disparate impact on non-whites.[19] It is, nevertheless, clear that some of the anecdotal references referred to black users.

Consequently, this Court is compelled to conclude that the defendants have failed to prove that either Congress or the Sentencing Commission acted with a discriminatory intent in fixing the penalties for drug offenses involving cocaine base.

Dr. Martin Shapiro, Ph.D., an expert in statistics, presented statistical evidence regarding the prosecutions in this district of defendants for cocaine base (crack) offenses (47 black persons, 3 hispanic persons and one white person)[20] and the prosecution of all defendants for all drug offenses (330 offenses involving cocaine base, cocaine base plus cocaine powder, cocaine powder, powder plus other substances, heroin, methamphetamine and miscellaneous). He then determined that blacks comprised one-half of the 330 prosecutions [150 defendants]. He then assumed that blacks should comprise one-half of each prosecution category (i.e., the expected ratio or probability). As virtually all cocaine base prosecutions involved black defendants, he concluded that the prosecution of blacks for cocaine base offenses could not occur randomly and was grossly disproportionate. Tr. 40–62.

While statistical evidence has the potential to establish a *prima facie* case in employment discrimination cases and in jury selection cases, it is not applicable here because the data base is flawed: there is no evidence establishing that whites, in fact, also distribute or use cocaine base in the same numbers as non-whites.[21]

Similarly, the record is devoid of any evidence that blacks use, distribute or manufacture methamphetamine.[22] Consequently, because the data base is conditioned on a flawed hypothesis, the statistical analysis fails to constitute relevant evidence of discrimination. *Compare McCleskey v. Kemp*, 481 U.S. 279, 294, 107 S.Ct. 1756, 1768, 95 L.Ed.2d 262, 279–280 (1987).

It simply confirms that few if any whites have chosen to become involved in cocaine base offense; or, if they have done so, they have successfully avoided detection and that few, if any, blacks have chosen to become involved in methamphetamine or LSD offenses with the same ensuing results. It is also clear that the reasons for selecting certain kinds of drugs but not others involves factors external to race and not implicated by the enactment of the statute and the guidelines.

As with the other issues, every federal appellate Court which has considered the issue also reached the same conclusion: the statute does not deprive minorities of equal protection even though virtually all persons charged thereunder are either black or hispanic. *See United States v. King, id; United States v. Solomon*, 848 F.2d at 157; *United States v. Thomas*, 900 F.2d at 39–40; *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir.1992); *United States v. Avant*, 907 F.2d 623, 627 (6th Cir.1990); *United States v. Lawrence*, 951 F.2d at 755; *United States v. Willis, id; United States v. Johnson*, 944 F.2d 396, 404 n. 7 (8th Cir.1991), *cert. den.,* — U.S. —, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991); *United States v. House, id.; United States v. Harding, id.; United States v. Savinovich,* 845

---

19. This Court is aware of the United States Sentencing Commission's August 22, 1991 Special Report on Mandatory Minimum Penalties. That Report does not, however, alter this opinion. *See* pp. 48–89, 118–124 of the Report.

20. The evidence established that this white female was jointly charged with her black male husband. *See* testimony of investigator Michael Hutcheson, Tr. 23.

21. The witness' exhibit indicates that only one white was charged with a cocaine base offense.

The defendants have failed to produce any credible evidence that whites, in fact, also use or distribute crack cocaine. See also fns. 18 and 20.

22. Shapiro's analysis showed that all persons charged in this district with methamphetamine offenses were white. Tr. 46. *See also* testimony of Drug Enforcement Administration Assistant Special Agent in Charge (ASAC) Joseph Sullivan. Tr. 175. This racial breakdown is also true as to LSD. *Id.* at 175.

F.2d at 838–39; *United States v. Cyrus,* 890 F.2d at 1248–49.

### C. THE TERM COCAINE BASE IS NOT UNCONSTITUTIONALLY VAGUE.

█ The Eleventh Circuit has ruled that the term "cocaine base" is not unconstitutionally vague, and encompasses "crack cocaine." *United States v. Williams,* 876 F.2d 1521, 1525 (11th Cir.1989). *See also United States v. Patrick,* 960 F.2d 950, 952, fn. 5 (11th Cir.1992). Other federal appellate courts have reached the same conclusion. *United States v. Williams, id.; United States v. Barnes,* 890 F.2d 545 (1st Cir.1989), *cert. den.,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); *United States v. Jackson,* 968 F.2d 158, 163 (2nd Cir.1992); *United States v. Collado–Gomez,* 834 F.2d 280 (2nd Cir.1987), *cert. den.,* 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988); *United States v. Pinto,* 905 F.2d 47 (4th Cir.1990); *United States v. Thomas, id.; United States v. Avant, id.; United States v. Wheeler,* 972 F.2d 927 (8th Cir. 1992); *United States v. House, id.; United States v. Buckner, id.; United States v. Harding, id.; United States v. Shaw,* 936 F.2d 412 (9th Cir.1991); *United States v. Van Hawkins,* 899 F.2d 852 (9th Cir.1990); *United States v. Turner, id.; United States v. Cyrus, id.; United States v. Brown,* 859 F.2d 974 (D.C.App.1988).

Indeed, Dr. George Schwartz, one of the defense experts, testified before the undersigned that cocaine base has a precise scientific formula, well recognized in the scientific community, which formula is distinct from other forms of cocaine.[23] *See* Tr. 77–81, 82, 98.

His testimony to the same effect was relied on in *United States v. Turner,* 928 F.2d at 956 and *United States v. Jackson,* 968 F.2d at 161–163.

While the Eleventh Circuit's decision is binding on this Court, this Court is compelled to independently reach the same conclusion—the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and it provides explicit standards to those who enforce it, thereby preventing arbitrary and capricious enforcements. *Grayned v. Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *United States v. Clavis,* 956 F.2d 1079, (11th Cir.1992), *cert. den.,* —— U.S. ——, 112 S.Ct. 2979, 119 L.Ed.2d 597 (1992).

### CONCLUSION

This Court has concluded that none of the constitutional attacks against the cocaine base statute and guidelines are meritorious.

IT IS, THEREFORE, RECOMMENDED that each of the foregoing defense Motions be DENIED.

IT IS SO RECOMMENDED.

This 5th day of November, 1992.

---

23. Dr. Schwartz further testified that the definition set out in *United States v. Brown,* 859 F.2d 974 (D.C.App.1988) is scientifically incorrect because it included the hydroxyl radical which is only applicable to inorganic chemistry. Tr. 97–99. Similar errors were made in *United States v. Avant,* 907 F.2d 623, 625, 627 (6th Cir.1990); *United States v. Buckner,* 894 F.2d 975 (8th Cir. 1990). Tr. 100.