**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12157

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JUSTIN CASE LEBARRON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00156-TPB-CPT-1

_____

Before ROSENBAUM, ABUDU, and TJOFLAT, Circuit Judges.

ABUDU, Circuit Judge:

Justin Case Lebarron was sentenced to two concurrent life sentences related to the death of one of his former drug associates,

J.B.,[1] from a mixture of fentanyl and methamphetamine. The government indicted him under 21 U.S.C. § 841 of the Controlled Substances Act ("CSA") for knowingly and intentionally conspiring in a drug trafficking ring to possess and distribute controlled substances, "the use of which resulted in the death of J.B. from such substance," ("Count I"); and possession with intent to distribute the actual drugs which killed her ("Count II").[2] On appeal, Lebarron challenges the district court's jury instruction regarding the proper application of subsection 841 (b)(1)(C)'s "death-result" penalty enhancement, which triggered the mandatory life sentences. After a thorough review of the record and the parties' briefs, we affirm Lebarron's convictions and sentence.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

On January 7, 2020, J.B. fatally overdosed in Lebarron's home. Security cameras installed throughout the home provide a picture of J.B.'s final moments.

On the afternoon of her death, J.B. made several drug sales. Security footage shows J.B. met customers at the front door of Lebarron's home, retrieved the agreed-upon quantities of drugs from

---

[1] In order to protect the identity of the victim, we refer to her by her initials throughout this opinion.

[2] Lebarron was convicted of a total of four counts; however, only Count I and Count II carried the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) which resulted in concurrent life sentences. On appeal, Lebarron only challenges his convictions and subsequent sentences as to Count I and Count II.

Lebarron's bedroom, and then returned to the front door to complete the exchanges.

At approximately 5:07 p.m., after completing what would be her final drug sale, J.B. entered Lebarron's bedroom—where Lebarron was present—and obtained narcotics.[3] J.B. then exited the bedroom and injected herself twice with the narcotics in the living room. As J.B. slowly lost consciousness, she slid face-first off a bed in the living room and onto the floor.

Two other men were in the living room with J.B., both of whom appeared to either be asleep or, like J.B., under the influence of narcotics. At approximately 6:07 p.m., one of the men in the living room, later identified as Vincent Sanchez, checked if J.B. was breathing, but he later returned to sit on the bed. At approximately 6:31 p.m., Sanchez attempted to wake J.B. but was unsuccessful.

Shortly thereafter, Brittney Smith, Lebarron's girlfriend, entered the room and checked on J.B. Lebarron entered soon after Smith and administered Naloxone[4] to J.B. Sanchez and Lebarron then placed J.B. on her back and attempted to revive her by

---

[3] While security cameras were not installed inside Lebarron's bedroom, footage from cameras placed throughout the rest of his home show that J.B. entered and exited Lebarron's bedroom around this time.

[4] "Naloxone is a life-saving medication that can reverse an overdose from opioids—including fentanyl, heroin, and prescription opioid medications—when given in time." *Lifesaving Naloxone*, CDC (June 11, 2025), https://www.cdc.gov/stop-overdose/caring/naloxone.html [https://perma.cc/E4X4-U8DG].

administering more Naloxone.  Another occupant, Michael Phelps, entered the living room and attempted to perform cardiopulmonary resuscitation ("CPR") on J.B.  While Phelps performed CPR, Lebarron tapped J.B. on her ribs and stomach, but she still would not wake up.

Lebarron then instructed a few of the people in the house to lift J.B. and carry her outside the house while he and others began removing narcotics and drug paraphernalia from the scene.  At approximately 6:40 p.m., three men carried J.B. outside and dumped her body in a vacant lot across the street.  While others were disposing of her body, Lebarron and his associates inside the home continued removing evidence of drug paraphernalia.  An autopsy and toxicological analysis later revealed lethal levels of both fentanyl and methamphetamine in J.B.'s bloodstream, meaning each drug independently could have killed her.

### A.  Lebarron's Drug Operation

Following a series of tips from informants and law enforcement's own undercover surveillance, police officers executed a search warrant on Lebarron's home on March 5, 2020.  They seized drugs and paraphernalia during the search, but they did not find Lebarron.  Later that day, authorities located Lebarron at a U-Haul storage facility, and he was arrested after a narcotics dog alerted officers to the presence of drugs in the storage unit.

Following his arrest, and upon further investigation, officers learned that Lebarron and Smith sold drugs, including fentanyl and methamphetamine, out of Lebarron's home in New Port Richey,

21-12157                Opinion of the Court                    5

Florida—the same home where J.B. died. The couple's drug operation worked as follows. Lebarron and Smith, who also were addicted to drugs, would store the narcotics in Lebarron's bedroom, where they stayed most of the time so that customers would not see them. J.B., along with others who would hang around the house, was one of Lebarron and Smith's drug dealers. The dealers would manage the front door and roam other parts of the house, but they normally did not go into the bedroom. When a customer would come to the front door, J.B. or another person would go to the bedroom to get the drugs from Lebarron and Smith to sell.

Lebarron monitored the drug sales from his bedroom through a home security system which provided live video footage capturing activity both inside and around the house. However, there were no cameras installed in the bedroom. Phelps testified that Lebarron knew J.B. often overdosed on drugs and forbade others in the house from giving her drugs.

### B. The Grand Jury Indictment

On April 15, 2021, a grand jury issued a superseding multi-count indictment against Lebarron which included the conspiracy, distribution, and possession charges in Counts I and II. Because of J.B.'s death in alleged association with Lebarron's alleged drug distribution and possession and because Lebarron had a prior conviction for a serious drug felony, the government sought to impose the enhanced penalty of life imprisonment set forth in 21 U.S.C. § 841(b)(1)(C) for both Count I and Count II. Lebarron pled not guilty to all charges and proceeded to trial in April 2021.

### C. *Motion in Limine*

Lebarron's theory of defense was that, while there might not be any doubt about whether he generally possessed and sold drugs, there was serious debate about where J.B. obtained the drugs that killed her. Lebarron's position was that J.B. either got the drugs that killed her from someone else, or that she stole the drugs from Lebarron, thus not making him culpable for her death under either scenario.

The district court permitted Lebarron to advance his first theory that J.B. bought the drugs that killed her from a different source altogether, but only in relation to challenging the actual distribution element the government was required to prove as part of the larger drug trafficking conspiracy to distribute and possess a controlled substance in Count I's charge for violation of Section 846.

However, as to whether J.B. might have stolen the drugs from Lebarron, the government moved *in limine* to exclude any such evidence. Lebarron opposed the motion and argued that "whatever killed her wasn't knowingly, intentionally, or in any way purposefully given to her" by Lebarron which meant he could not have caused her death.

Lebarron sought to introduce evidence that J.B. stole the drugs as a defense against Count I, the drug trafficking conspiracy charge, as well as Count II, the claim for possession with intent to distribute a controlled substance which resulted in death. As the evidence related to the connection between Lebarron's possession

of the controlled substance in violation of subsection 841(a)(1) and J.B.'s death, the government asserted that the appropriate question was not whether J.B. stole or bought the drugs from Lebarron. Instead, according to the government, if Lebarron "possessed [the drugs] with the intent to distribute, and those [drugs] are taken from [his] room . . . and somebody dies," Lebarron was guilty.

The district court allowed Lebarron to argue that J.B. stole the drugs as a defense against the distribution element of the drug trafficking conspiracy charge (Count I), but not with respect to the conspiracy to possess with intent to distribute charge (Count II). The court also prohibited Lebarron from arguing that the alleged theft of drugs was the cause of J.B.'s death. Overall, the district court reasoned that, "according to the law," a defendant's inability to "actually distribute" a controlled substance "because someone stole it first" did not change the fact that the defendant was "still guilty" of possession with intent to distribute in violation of subsection 841(b)(1)(C).

During the trial, defense counsel cross-examined witnesses about several issues pertaining to J.B., including: (1) the circumstances surrounding her death; (2) her involvement in selling drugs; (3) her history with drug use; (4) her history of stealing drugs; and (5) the evidence regarding where she obtained the drugs that killed her. However, he abided by the district court's directive and did not argue that J.B.'s alleged theft of the drugs caused her death.

### D.  The Jury Instructions

At the close of both parties' case-in-chief, the court issued its instructions to the jury.  As to Count I, it instructed the jury to determine: (1) whether Lebarron "agreed to accomplish a shared and unlawful plan to distribute or possess with intent to distribute a mixture or substance containing a detectable amount of fentanyl or methamphetamine," and (2) whether Lebarron "knew the unlawful purpose of the plan and willfully joined in it."  As to J.B.'s death, the jury was instructed that if they found Lebarron was guilty of Count I, they would then need to determine whether J.B.'s "use of the mixture or substance that [Lebarron] conspired to distribute, or possess with intent to distribute[,] was the *but-for cause* of JB's death."

For Count II, the court instructed the jury to determine: (1) whether Lebarron "knowingly or intentionally distributed or possessed with intent to distribute a controlled substance;" and (2) whether Lebarron "knew at the time of distribution that the substance he distributed or possessed with the intent to distribute was a controlled substance."  Regarding J.B.'s death, the jury had to decide whether her "use of the mixture or substance that [Lebarron] distributed or possessed with the intent to distribute was the but for cause of [J.B.'s] death."

### E.  Jury Verdict and Sentencing Phase

The jury found that with respect to Counts I and II, J.B.'s use of the drugs that Lebarron possessed were "the 'but-for' cause of J.B.'s death."  Thus, the jury convicted him on all counts in the

indictment, including Counts I and II, thus triggering the "death results" penalty enhancement provision in subsection 841(b)(1)(C). On June 17, 2021, the district court sentenced Lebarron to two concurrent terms of life in prison.[5]  He then filed this appeal.

## II. STANDARD OF REVIEW

Ordinarily, we review the district court's grant of the government's motion *in limine* for an abuse of discretion.  *United States v. Estrada*, 969 F.3d 1245, 1261 (11th Cir. 2020).  However, because the district court's ruling was based in part on its interpretation of subsection 841(b)(1)(C), we exercise *de novo* review.  *United States v. Marte*, 356 F.3d 1336, 1345 (11th Cir. 2004) ("When the district court grants a motion in limine based on a legal conclusion that a defense is not permissible, we review that determination *de novo*."); *see also United States v. Segarra*, 582 F.3d 1269, 1271 (11th Cir. 2009) ("We review questions of statutory interpretation *de novo*.").

## III. DISCUSSION

The crux of Lebarron's appeal challenges the application of the death-results penalty enhancement provision in subsection 841(b)(1)(C) which resulted in his two mandatory life sentences.  He first argues that the "use of such substance" clause required the government to prove that he knowingly and intentionally gave J.B. the drugs that killed her, not just that he merely possessed the drugs as part of his regular narcotics operation.  Second,

---

[5] Lebarron also was sentenced to a 30-year term as to Count IV and a 20-year term as to Count V, all of which run concurrently.

he contends that the subsection's "results from" clause further allows for an "intervening cause" defense which, if J.B. stole the drugs, would warrant acquittals for Counts I and II. Based on the plain reading of subsection 841(b)(1)(C), coupled with Lebarron's conviction for the underlying crimes set forth in subsection 841(a), the district court's application of the penalty enhancement was proper. Therefore, we affirm Lebarron's convictions and the resulting life sentences.

### A. Subsection 841(b)(1)(C)'s "death-results" penalty enhancement provision applies to both actual distribution and possession with the intent to distribute.

We begin our analysis with "the plain language and structure of the statutory scheme itself and then our precedent regarding that statute." *United States v. Sanchez*, 269 F.3d 1250, 1263 (11th Cir. 2001) (*en banc*), *abrogated in part on other grounds by Alleyne v. United States*, 570 U.S. 99, 103 (2013). "In reviewing a statutory scheme, our task is to construe what Congress has enacted." *Id.* (internal quotation marks and citations omitted). *See also United States v. Rodriguez*, 628 F.3d 1258, 1264 (11th Cir. 2010) ("The starting point for all statutory interpretation is the language of the statute itself and we look to the entire statutory context." (quotation marks and citation omitted)), *abrogated in part on other grounds by Van Buren v. United States*, 593 U.S. 374, 381 n.2 (2013). Because both subsections are contained within Section 841, we read both provisions in conjunction. *See Smith v. United States*, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute."); *see also Gonzales v. Oregon*, 546 U.S.

243, 273 (2006) ("[S]tatutes should not be read as a series of unrelated and isolated provisions." (internal quotations marks and citation omitted)).

> 1. Subsection 841(b)(1)(C)'s penalty enhancement provision is triggered by a violation of subsection 841(a), not an additional *mens rea* finding.

Taken together, the two subsections provide, in relevant part, that:

> [I]t shall be unlawful for any person knowingly or intentionally –
>
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
>
> (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

21 U.S.C. § 841(a);

> If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment . . .

*Id.* § 841(b)(1)(C).

The statutory scheme is clear: subsection 841(a) and 841(b)(1)(C) jointly provide penalties for prohibited criminal conduct, with subsection 841(a) outlining the criminal offenses and subsection 841(b)(1)(C) providing the mandatory penalty provisions for those offenses. *See United States v. Colston*, 4 F.4th 1179, 1188 (11th Cir. 2021) ("Section 841(b), on the other hand, provides the penalties for violations of § 841(a)(1) . . . ."); *see also United States v. Jeffries*, 958 F.3d 517, 521 (6th Cir. 2020) ("Section 841(b)(1)(C) is merely the penalty tied to the conduct proscribed in § 841(a)(1). It does not speak to the defendant's conduct or the general causal connection between § 841(a)(1) and the death."). Subsection 841(b)(1)(C)'s penalties are not a standalone criminal offense; rather, its sentence enhancement penalties are only triggered once a defendant has been convicted under subsection 841(a). *See Sanchez*, 269 F.3d at 1264–65 (explaining how subsection 841(b)(1)(C) applies after a substantive violation of § 841(a)). While a conviction under subsection 841(a) requires a finding of "knowing and intentional" conduct, given that subsection 841(b)(1)(C) outlines the penalties for violations of subsection 841(a), a separate *mens rea* finding is not necessary for subsection 841(b)(1)(C) to apply. *See United States v. Sanders*, 668 F.3d 1298, 1310 (11th Cir. 2012) (explaining that although the jury must determine whether the facts that trigger subsection 841(b)(1)(C) penalties are established beyond a reasonable doubt, the government does not have to prove *mens rea* in relation to these facts).

The Supreme Court has confirmed this understanding of the relationship between the two subsections. In *Terry v. United*

*States*, the Court addressed whether the Fair Sentencing Act modified the statutory penalties for a petitioner's offense under Section 841. 593 U.S. 486, 492 (2021). In answering that question, the Court first explained that, when taken together, "[s]ubsection (a) makes it unlawful to knowingly or intentionally *possess with intent to distribute* any controlled substance. Subsection (b) lists additional facts that, if proved, trigger penalties." *Id.* (emphasis added).

Similarly, in *Burrage v. United States* the Supreme Court explained that the "two principal elements" of a violation of subsection 841(a)(1) and (b)(1)(C) are "(i) *knowing or intentional* distribution of [a controlled substance] . . . and (ii) death caused by ('resulting from') the use of that drug." 571 U.S. 204, 210 (2014) (emphasis added). In defining the two principal elements, the Supreme Court expressly limited the *mens rea* requirements to the core crime—the violation of subsection 841(a). That distinction further supports the proper and automatic application of subsection 841(b)(1)(C)'s penalty provision once a violation under subsection 841(a) is established.

Lebarron asserts that, when read correctly, subsection 841(b)(1)(C)'s penalty enhancement provision only applies to a defendant's knowing or intentional *actual* distribution of a controlled substance. In support of this argument, Lebarron contends that the *mens rea* required by subsection 841 (a)(1)—"knowingly or intentionally"—modifies every material element of the statute, including subsection 841 (b)(1)(C)'s "use of such substance" clause. He argues that for a defendant's conduct to have resulted in the use

of substances responsible for a person's death, the defendant had to "knowingly or intentionally" provide the deceased with the substance or, at a minimum, knowingly or intentionally put the deadly substance "into the chain of distribution." Accordingly, he contends that it is "impossible for a defendant to knowingly or intentionally" provide someone with a controlled substance "if she unexpectedly stole it."

In attempting to advance his position, Lebarron ignores not only the subsections' plain language, but the body of cases which already have fleshed out the relationship between the two provisions and outlined the government's burden of proof. In fact, Lebarron admits through the framing of his argument that subsections 841(a) and 841(b)(1)(C) are inextricably intertwined. His misinterpretation, however, is as to *how* the two subsections are intertwined.

To be clear, subsection 841(a) does have a *mens rea* requirement; in order to be convicted under subsection 841(a), a defendant must have *knowingly* or *intentionally* manufactured, distributed, or dispensed, or possessed with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S.C. § 841(a). Yet, once a defendant is convicted under subsection 841(a), the language of subsection 841(b)(1)(C) is clear that there is not an additional *mens rea* analysis required for its sentence enhancement to apply.[6]

---

[6] For the reasons explained, we find that Section 841 and the subsections at issue are unambiguous. So we cannot and would not defer to agency interpretations of Section 841. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–

2. <u>The district court correctly applied subsection 841(b)(1)(C)'s "death-results" penalty enhancement.</u>

Given the relationship between the two subsections, our review of the district court's application of subsection 841(b)(1)(C)'s death enhancement must start with Lebarron's conviction under subsection 841(a). There was sufficient evidence presented at trial that Lebarron violated subsection 841(a), as the government proved that Lebarron possessed a controlled substance with the intent to distribute, and did in fact distribute controlled substances. Lebarron concedes this on appeal. We then turn to subsection 841(b)(1)(C).

As we have explained, subsection 841(b)(1)(C)'s penalty enhancement provision is automatically triggered by *any* violation of subsection 841(a) involving (1) "a controlled substance in schedule I or II, gamma hydroxybutyric acid . . . or 1 gram of flunitrazepam"(2) resulting in "death or serious bodily injury," (3) committed by a defendant "after a prior conviction for a felony drug offense has become final," regardless of whether the violation occurs through a defendant's actual distribution of drugs or his mere intent to distribute controlled substances. 21 U.S.C. § 841(b)(1)(C). Lebarron's contention that there must be a finding that he placed

---

13 (2024). Still, our interpretation is consistent with the Sentencing Commission's own reading, as evidenced in its explanation for Amendment 817 which, in relevant part, explains that subsection 841(b)'s penalty provisions "provide enhanced mandatory minimum penalties . . . if death or serious bodily injury occurred as a result of the instant offense *and* the defendant has a qualifying prior conviction." U.S.S.G., amend. 817 (2023) (emphasis added).

the controlled substance into the market is irrelevant to our actual inquiry. Only the second requirement—death or serious bodily injury resulting from the defendant's violation of subsection 841(a)—is contested.

This jury verdict came after a four-day trial in which the jury heard witness testimony about the circumstances surrounding J.B.'s death, her involvement in Lebarron's drug sales, her history with drug use, Lebarron's previous instructions to not give J.B. drugs, and the lack of evidence confirming where J.B. obtained the drugs that killed her, as well as testimony from the medical examiner who performed J.B.'s autopsy. Viewed in the light most favorable to the verdict, *see United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997), this testimony proved, in relevant part, that Lebarron sold drugs out of his home and frequently employed J.B., a drug addict, to sell drugs for him. Furthermore, while the district court precluded Lebarron from asserting theft as a defense, the evidence proved that J.B. previously stole drugs from Lebarron and had previously overdosed, which ultimately led to Lebarron preventing others from supplying J.B. with drugs.

Although there was no evidence conclusively indicating whether Lebarron refused to give her drugs or forbade others from doing so on the day J.B. died, the jury saw video footage of J.B. go into Lebarron's bedroom where he stored the drugs, and exit from the room with what appeared to be narcotics, shortly before she overdosed in his living room while he was just a few feet down the hall. Based on this evidence, the jury found that J.B.'s "use of the

mixture or substances that [Lebarron] distributed or possessed with an intent to distribute was the but-for cause of [her] death."

In short, subsection 841(b)(1)(C) is triggered once there is any substantive violation of subsection 841(a), including the possession of a controlled substance with the intent to distribute, that results in serious bodily harm or death. The automatic nature of subsection 841(b)(1)(C)'s application means that a separate and additional *mens rea* finding is not required once a violation of subsection 841(a) is established. The government does not need to show that the defendant knew or intended for the victim to use the controlled substance. Accordingly, the district court's interpretation and application of subsection 841(b)(1)(C)'s penalty enhancement was proper. Because Lebarron was found guilty of violating subsection 841(a), the jury was properly instructed to consider whether the facts justifying subsection 841(b)(1)(C)'s "death-results" penalty enhancement were present without any need for an additional *mens rea* finding.

### B. Subsection 841(b)(1)(C)'s "death-results" penalty enhancement provision does not require proof of proximate cause or allow for an intervening cause exception.

Lebarron also contends the district court erred when it concluded that subsection 841(b)(1)(C) does not allow for an "intervening cause" defense, thus preventing him from arguing that J.B. stole the drugs that killed her and that theft was the superseding cause of her death, not any direct act on his part. Lebarron points to subsection 841(b)(1)(C)'s "results from" clause, which limits the

death-result enhancement to instances where death or serious bodily injury *results from* the use of the controlled substance the defendant either actually distributed or possessed with the intent to distribute. He asserts that the clause incorporates common law standards of factual causation. As he explains, intervening cause was a "good defense" at common law because factual causation was a material element. Accordingly, Lebarron reasons that the "results from" clause not only requires but-for causation, but also incorporates an intervening cause defense and that he should have been allowed to argue that if there was an intervening, unforeseeable circumstance between his possession of the controlled substance and J.B.'s fatal overdose, such as her stealing the drugs, then her death did not "result from" his offense.

As a general matter, criminal statutes often impose varying types of causation requirements, with the most common ones being actual, or but-for causation, and proximate cause. *See Burrage*, 571 U.S. at 210 ("When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result." (internal citation omitted)); *see also United States v. Rodriguez*, 766 F.3d 970, 980 (9th Cir. 2014) ("[A] basic tenant of criminal law is that, when a criminal statute requires that the defendant's conduct has resulted in an injury, the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury." (internal citation omitted)).

If harm occurs and it only could have happened because of the defendant's conduct, the defendant's conduct is the actual, or but-for, cause of the harm. *Burrage*, 571 U.S. at 211. This type of harm encompasses the "common understanding of cause"—where "one event is the outcome or consequence of another when the former would not have occurred but for the latter." *Id.* at 212. Unless the plain text or context of a statute indicates otherwise, "courts regularly read phrases like 'results from' in a criminal statute to require but-for causality." *Id.*

On the other hand, when the harm or risk that occurs was a foreseeable outcome of a defendant's conduct, or within the "scope of the risk" created by the defendant's predicate acts, the defendant's conduct is the proximate, or legal, cause of the harm. *Paroline v. United* States, 572 U.S. 434, 445 (2014). Unlike actual or but-for cause, which primarily is focused on identifying the factual connections between the defendant's conduct and the harm, proximate cause is concerned with limiting liability to only those situations where there is a clear causal link between the defendant's conduct and the result. *Id.*

Actual, or but-for, cause is defeated by showing that there is no causal link between the defendant's conduct and the harm at issue, meaning that the harm would have resulted without the defendant's conduct. While a single event can have multiple "but-for" causes, if the conduct at issue is taken out of the equation and the outcome remains the same, then it is not a but-for cause of the harm. *See Lapham v. Walgreen Co.*, 88 F.4th 879, 894 (11th Cir. 2023)

(finding that retaliation against employee for requesting leave to care for her disabled child was not "but-for" cause of her termination where employer proffered evidence of employee's negative performance).

The chain of proximate cause can be broken by an intervening cause. An intervening cause is an event or action that occurs after the defendant's predicate conduct and before the harm, altering the natural course of events. *Intervening Cause*, BLACK'S LAW DICTIONARY (12th ed. 2024). An intervening act disrupts proximate causation but does not impact causation-in-fact. *See United States v. Monzel,* 641 F.3d 528, 537 (D.C. Cir. 2011) (explaining that where Congress removes proximate cause liability, liability attaches to "all sorts of injuries a defendant might indirectly cause, no matter how remote or tenuous the causal connection"); *United States v. Burgess*, 684 F.3d 445, 458 (4th Cir. 2012) (same).

Additionally, there are limits to when an intervening cause defense may apply, as not every intervening act is sufficient to break the chain of causation. Indeed, courts typically reject intervening cause defenses where the intervening cause was foreseeable. *See, e.g., United States v. Rodriguez*, 279 F.3d 947, 952 (11th Cir. 2002) (concluding that even if subsection 841(b)(1)(C) permitted an intervening cause defense, "foreseeable negligent acts of a third party" would not sever the chain of causation); *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (explaining that intervening actions of others, such as lawsuits, break the chain of causation only where they are "unforeseeable"); *United States v. Killmartin*, 944 F.3d 315,

331 (1st Cir. 2019) (finding that even if statute required proximate cause in addition to but-for cause, defendant's intervening cause argument failed to break proximate cause where victim's death was "entirely foreseeable" outcome of defendant mailing cyanide to him).

With these definitions in mind, we turn to our prior interpretation of subsection 841(b)(1)(C)'s causation requirement.[7]  In *United States v. Webb*, we made it clear that a finding of proximate cause is not a requirement under subsection 841(b)(1)(C).  655 F.3d 1238, 1250 (11th Cir. 2011).  In *Webb*, the defendant, a doctor, was convicted of health care fraud and the death of a patient which the indictment alleged was caused either by the fraud or by his unlawful dispensing of controlled substances. *Id.* at 1240–41.  Under subsection 841(b)(1)(C)'s penalty enhancement provision, he was sentenced to concurrent life sentences on the death-resulting convictions. *Id.* at 1240.  The dispute in *Webb* "center[ed] on whether [subsection] 841(b)(1)(C)'s death-result penalty enhancement require[d] the jury to find (1) merely that the [victim]'s use of the controlled substance (unlawfully prescribed by Webb) was the

---

[7] While our analysis would typically begin with a look at the language of subsection 841(b)(1)(C)'s "results from" clause, our prior-panel precedent restricts our interpretation to that which was established in prior cases interpreting this same subsection. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001); *cf. Bourdon v. U.S. Dep't of Homeland Sec.*, 940 F.3d 537, 548 (11th Cir. 2019) ("[S]tare decisis doesn't apply to statutory interpretation unless the statute being interpreted is the same one that was being interpreted in the earlier case.")

actual cause of death; or (2) that Webb's conduct proximately caused the death or at least that the death was reasonably foreseeable to Webb." *Id.* at 1249.

We joined several of our sister circuits and held that subsection 841(b)(1)(C)'s enhanced penalty requires only proof that the death resulted from the victim's use of a controlled substance dispensed by the defendant. *Id.* at 1250; *see, e.g.*, *United States v. Patterson*, 38 F.3d 139 (4th Cir. 1994); *United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999); *United States v. McIntosh*, 236 F.3d 968 (8th Cir. 2001). In reaching that conclusion, we determined that there is no "foreseeability or proximate cause language in [the] statute" and therefore the penalty enhancement may apply "regardless of whether the [d]efendant knew or should have known that death would result." *Id.* at 1257. This is because the language of subsection 841(b)(1)(C) only "requires a cause-in-fact connection between the victim's ingestion of the drugs and death. It does not require that the defendant's conduct proximately cause the death." *Id.* at 1254. It follows that because subsection 841(b)(1)(C) does not have a proximate cause requirement, an intervening cause defense cannot be used to challenge its application. *See Monzel,* 641 F.3d at 537.

Under our well-established prior panel precedent rule, a holding by "the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *Smith*, 236 F.3d at 1300 n.8. Lebarron attempts to sidestep this clear barrier that *Webb* poses. While he does not

dispute that the "results from" clause creates a factual, but-for causation requirement, he nevertheless argues that even under the but-for causation standard, an intervening cause, such as J.B.'s theft of the drugs, can be a defense against the penalty enhancement provision.

Lebarron's argument is unconvincing. He essentially is arguing that in addition to the "actual or but-for" causation requirement the district court instructed the jury on, subsection 841(b)(1)(C)'s language that a death must "result from the use of such substance" permits a defendant to raise a proximate cause defense. Under this interpretation, Lebarron contends that he was neither the actual cause of J.B.'s death, as he did not directly give her the drugs, nor was he the proximate cause, as her theft of the drugs was not reasonably foreseeable. Although Lebarron calls this proximate cause argument an "intervening cause" defense, we are not convinced of any meaningful distinction between the two.

Instead, Lebarron's intervening cause defense argument is, at bottom, a proximate cause argument that, is incompatible with subsection 841(b)(1)(C)'s but-for causation language for several reasons. *See, e.g., Saunds v. Washington*, No. 4:23-cv-280, 2025 WL 1485856, at *3 (N.D. Ga. Jan. 6, 2025) ("One method for disproving proximate cause is the 'doctrine of intervening causes.'" (citing *City of Richmond Hill v. Maia*, 800 S.E.2d 573, 576 (Ga. 2017)). Primarily, his proposed interpretation of the "results from" clause ignores the subsection's most clear, direct, and simple application. As we have

24                    Opinion of the Court                    21-12157

explained, an intervening cause argument is a defense to *proximate* cause, not actual, but-for cause.[8]

Lebarron attempts to take advantage of the fact that our opinion in *Webb* does not expressly foreclose his proposed intervening cause defense and deals with a death resulting from a defendant's actual, direct distribution. For support, he relies on the Supreme Court's ruling in *Burrage*. In *Burrage,* which was decided three years after we issued our opinion in *Webb*, the defendant, a drug dealer, was sentenced to 20 years' imprisonment under subsection 841(b)(1)(C)'s penalty enhancement provision following his conviction for the sale of heroin that resulted in someone's death. 571 U.S. at 206–08. There, the deceased, a long-time drug user, died following an extended drug binge that began with him using

---

[8] To the extent that an intervening cause defense was a good defense to actual, but-for cause at common law as Lebarron argues, that common-law rule does not apply here. Congress is permitted to abrogate underlying common law principles by speaking directly to the question addressed by the common law. *See United States v. Texas*, 507 U.S. 529, 534 (1993) (explaining that presumption of retention of common-law principles does not apply where Congress "speaks directly" to the principle). Here, for the reasons the Tenth Circuit explained in *United States v. Burkholder,* 816 F.3d 607, 621 (10th Cir. 2016), while discussing subsection 841(b)(1)(E)'s "death results" language, "Congress has unambiguously expressed a desire to deviate from common-law principles," as evidenced by the "plain language and statutory context of the 'results from' language." *See also United States v. Harden*, 893 F.3d 434, 447–48 (7th Cir. 2018) (rejecting common-law principles and proximate cause requirement in application of section 841(b)(1)(C) and affirming conviction and sentence under subsection 841(b)(1)(C) where government presented sufficient evidence that defendant's conspiracy to distribute heroin was "but-for" cause of victim's death).

21-12157                Opinion of the Court                25

several drugs throughout the day before purchasing one gram of heroin from the defendant. *Id.* at 206.

A key issue at trial was determining which of the drugs killed him. Two medical experts testified that while the toxicologist report revealed morphine, a heroin metabolite, as the only drug present at a level above the therapeutic range, they "could not say whether [the deceased] would have lived had he not taken the heroin." *Id.* at 207. The trial court rejected the defendant's proposed jury instructions which sought to require the government's burden to prove that heroin use was the "proximate cause" of death and instead gave an instruction that it was the government's burden to prove that heroin was a "contributing cause" of the death. *Id.* at 208.

In evaluating the trial court's jury instructions, the Supreme Court began by explaining that "[t]he law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause" and that "a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result." *Id.* at 210 (internal quotation marks and citations omitted). The Supreme Court's discussion of proximate cause was limited in *Burrage*, as it found that only a discussion of actual cause was necessary to the case before it. *Id.* However, the Supreme Court noted that in the absence of "textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality." *Id.* at 212. The Court then concluded that "where use

of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at 218–19.

We find no reason to believe that *Burrage* has abrogated or overruled our holding in *Webb*. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point." (quoting *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003))). It remains the case that the plain and unambiguous language of subsection 841(b)(1)(C) requires a but-for causation analysis that does not contain a foreseeability or proximate cause requirement. *See Webb*, 655 F3d at 1254; *Muller*, 819 F. App'x. at 713 n.6.

In the years since *Webb* and *Burrage*, the relevant language of subsection 841(b)(1)(C) has not been modified to indicate otherwise, nor has Congress expressed a contradicting intent.[9]

---

[9] Indeed, scholars have noted that this reading is consistent with Congress's intent. Congress's use of the phrase "results from" requires a but-for causation analysis that reflects the nature of deaths in drug overdose cases, as well as Congress's intent to "enact[ ] harsh laws to prosecute those sold drugs that led to accidental overdoses." Kaitlin S. Phillips, Note, *From Overdose to Crime Scene: The Incompatibility of Drug-Induced Homicide Statutes with Due Process*, 70 DUKE L.J. 659, 662 (2020). If an autopsy reveals the presence of a deadly level of a controlled substance in a victim's blood, the controlled substance is a but-for cause of death, so long as no other factors, such as other drugs or other

21-12157               Opinion of the Court                 27

Moreover, after *Burrage*, the Sixth Circuit has explained that it reads the statute the same way we do, as do the First, Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits. Each circuit, either before or after *Burrage*, has independently held that foreseeability is not a component of subsection 841(b)(1)(C)'s causation analysis. *Jeffries*, 958 F.3d at 520, 524. Lebarron cites no circuits that have adopted his view of subsection 841(b)(1)(C).

Indeed, the Sixth Circuit recently adopted a similar approach in *Jeffries*. There, the defendant was convicted of drug-related offenses, in violation of subsection 841(a)(1) and subsection 841(b)(1)(C). *Id*. at 518. The victim was discovered in her home following an apparent drug overdose. Officers found text messages indicating that the victim had attempted to buy or actually bought drugs from the defendant on the same day she overdosed. *Id*. At trial, the district court said it was giving a but-for instruction, but in violation of *Burrage*, the instruction mistakenly asserted that "there is 'but for' causation where use of the controlled substance, combined with other factors to produce death and death would not have occurred without the incremental effect of the controlled substance." *Id*. at 518–19. The defendant sought a new trial, and the district court determined it had erred by not giving a proximate-cause instruction. *See id*. at 519. The government appealed. *Id.*

---

physical injury, are present. The but-for causation analysis permits the application of the penalty enhancement provision in the event of accidental overdoses, as the statutory text indicates Congress intended.

Accordingly, the issue before the Sixth Circuit was whether the district court properly construed subsection 841(b)(1)(C) to require proof of proximate causation after first finding the subsection's language ambiguous. *Id.* at 519. In concluding that subsection 841(b)(1)(C) does not require proof of proximate causation, the Sixth Circuit expressly rejected the district court's interpretation of *Burrage*. The district court opined that the *Burrage* Court may have viewed the statutory language in subsection 841(b)(1)(C) to be ambiguous, as it employed traditional modes of statutory interpretation in reaching its conclusion. *Id.* at 522. Based on that understanding, the district court held that subsection 841(b)(1)(C) was "broad enough, on its face, to encompass both proximate and but-for causation." *Id.*

The Sixth Circuit explained that while the *Burrage* Court did employ traditional modes of statutory interpretation to explain the meaning of subsection 841(b)(1)(C)'s "results from" clause, it did so only after ascertaining the ordinary meaning of the phrase, as the Controlled Substance Act did not define it. To the extent that the *Burrage* Court employed additional methods of statutory interpretation, the Sixth Circuit explained that it did so not because subsection 841(b)(1)(C)'s terms were ambiguous, but instead because these other methods bolstered its conclusion. *Id.* (citing *Burrage*, 571 U.S. at 210–11). Like the Sixth Circuit, we find that *Burrage* does not disturb our conclusion that the plain and unambiguous language of subsection 841(b)(1)(C) requires a but-for causation analysis that does not contain a foreseeability or proximate cause requirement.

Because we reiterate here that subsection 841(b)(1)(C)'s language speaks only to actual or but-for cause, not proximate cause, the district court's jury instructions as to causation were a correct statement of the law and the court did not err in denying Lebarron's requested jury instruction.

## IV. CONCLUSION

The district court did not err when it concluded that a plain reading of subsection 841(b)(1)(C)'s penalty enhancement provision: (1) applies to all violations of subsection 841(a), including possession of a controlled substance with the intent to distribute, (2) does not have a separate or additional *mens rea* requirement, and (3) does not permit an intervening/proximate cause defense. For the reasons we have explained, we affirm Lebarron's convictions and sentence.

**AFFIRMED.**

21-12157                ABUDU, J., Concurring                            1

ABUDU, Circuit Judge, joined by ROSENBAUM, Circuit Judge, concurring:

Our judgment today falls squarely in line with the precedent our Circuit established in *United States v. Webb*, 655 F.3d 1238, 1250 (11th Cir. 2011), which forecloses Lebarron's principle argument on appeal. I write separately to propose that we convene *en banc* to consider overruling the holding in *Webb* "that [subsection] 841(b)(1)(C)'s enhanced penalty requires only proof that the death resulted from the victim's use of a controlled substance dispensed by the defendant." *Id.*

Undoubtedly, as my dissenting colleague notes, the fact that our decision is the one mandated by our prior precedent is little consolation in the face of legitimate due process concerns. He is correct that "as a matter of basic due process, the Resulting-in-Death Enhancement is best read to include a proximate cause requirement and to allow for an intervening cause defense." Notwithstanding, only this Court sitting *en banc* or the Supreme Court may overrule our binding precedent set forth in *Webb* and change "the law of this Circuit." *See Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). While the majority opinion's strict adherence to our prior panel precedent rule precludes us, as a three-judge panel, from reaching the result the dissent advances—it does not prevent this Court sitting *en banc* from reversing course when the law, as better understood today, requires that we do so.

I must first reiterate why *Webb* does in fact squarely bar an intervening cause defense such as the one Lebarron sought to

2                     ABUDU, J., Concurring                    21-12157

introduce here.  Affirmative defenses typically fall into two catego-
ries: (1) the "substantive law defenses which negative guilt by can-
celling out the existence of some required element of the crime,"
and (2) those defenses which "do not negative any of the elements
of the crime but instead go to show some matter of justification or
excuse which is a bar to the imposition of criminal liability."
1 W. LaFave, Substantive Criminal Law § 1.8(c) (3d ed. 2025); *see
also United States v. Shamsid-Deen*, 61 F.4th 935, 948 (11th Cir. 2023).

As to the first category of defenses—the substantive law de-
fense—the district court correctly permitted Lebarron to introduce
evidence of J.B.'s theft of the drugs where such evidence directly
challenged the existence of a necessary element of the crime, spe-
cifically the actual distribution element the government was re-
quired to prove in Count I as part of the larger drug trafficking con-
spiracy to distribute and possess a controlled substance.  Count II,
on the other hand, did not require the government to prove that
Lebarron was the proximate, or legal, cause of J.B.'s death.  Accord-
ingly, the district court correctly denied Lebarron's requested jury
instruction that J.B.'s alleged theft of the drugs be presented as an
intervening cause for purposes of Count II.

The second category of defenses—those showing some jus-
tification against imposing criminal liability—speaks squarely to
proximate cause, which serves to "preclude liability in situations
where the causal link between conduct and a result is so attenuated
that the consequence is more aptly described as mere fortuity." *Pa-
roline v. United States*, 572 U.S. 434, 445 (2014).  However, as the

21-12157                ABUDU, J., Concurring                    3

majority opinion recognizes, *Webb* has rejected any proximate cause requirement. *See Webb*, 655 F.3d at 1254–55 ("The statute requires a cause-in-fact connection between the victim's ingestion of the drugs and death. It does not require that the defendant's conduct proximately cause the death."). Because our prior panel precedent expressly forecloses a proximate cause inquiry, any defense limiting a defendant's proximate cause liability is not permitted.[1] *See Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*, 944 F.3d 886, 897 (11th Cir. 2019) (Tjoflat, J., dissenting) ("At bottom, proximate cause is a limit on legal liability. . . . A determination that certain conduct is not the proximate cause of a loss is not to say that the conduct is not a cause in fact of the loss." (internal quotation marks and citation omitted)).[2]

---

[1] To the extent that Lebarron does in fact seek to raise evidence of J.B.'s theft of the drugs as a challenge to but-for causation, such a defense is unavailable given the Supreme Court's broad definition of but-for cause. As the Supreme Court explained in *Burrage v. United States*, but-for causation encompasses "conduct [that] is the cause of a result, if it is an antecedent but for which the result in question would not have occurred." 571 U.S. 204, 211 (2014) (internal citation and quotation marks omitted). Here, Lebarron's possession of the drugs was the "but-for" cause of J.B.'s death; if he had not possessed the drugs he alleges J.B. stole, she would not have had access to ingest them.

[2] Even if an intervening cause could be a defense to a broader finding of actual cause, or cause in fact, like the dissent proposes, an intervening cause defense is tailored to strike at proximate cause. Actual cause, which is traditionally defined as both but-for and proximate cause, is defeated by proving that either but-for or proximate cause do not exist. Any inclusion of an intervening cause defense is aimed at challenging foreseeability and liability, the very same issues proximate cause addresses. Therefore, an intervening cause is relevant to the

4                    ABUDU, J., Concurring                    21-12157

As my dissenting colleague succinctly lays out, in restricting our inquiry here today, *Webb* departs from the longstanding understandings of causation in the criminal law context. *Webb's* notion that foreseeability and sufficient causal connection between wrongful conduct and the harm are not necessary inquiries when applying subsection 841(b)(1)(C)'s penalty enhancement imposes a strict liability regime that we historically have refused to adopt in the absence of clear statutory language or congressional intent. *See United States v. Perez*, 160 F.4th 1193, 1199 (11th Cir. 2025) (Abudu, J., concurring) ("As a matter of public policy, and perhaps due process, a sentencing framework that allows wide discretion to increase one's sentence while barring comparable discretion for downward departures warrants reevaluation."). Although the Supreme Court has not reached the issue before us, its approach to causation outlined in both *Burrage* and *Paroline* is instructive. In the absence of express instructions from Congress on the type of causation necessary, *Webb* provided no valid basis for departing from the customary understanding of "proximate cause's traditional role in causation analysis." *Paroline*, 572 U.S. at 446.

The district court was bound by *Webb* in denying Lebarron's request for a jury instruction for a defense not related to the government's burden of proof. *See Jonas v. City of Atlanta*, 647 F.2d 580, 586 (5th Cir. Unit B 1981) ("Because the charge was not relevant to any of the determinations to be made by the jury, it should not

---

proximate cause inquiry, which in turn affects actual cause, and does not deal with but-for cause—the only causation standard applicable here under *Webb*.

21-12157                 ABUDU, J., Concurring                          5

have been given."), *abrogated in part on other grounds as recognized in Lindsey v. Storey,* 936 F.2d 554, 561 (11th Cir. 1991).[3]  However, *Webb*'s holding should no longer stand.  In this case, Lebarron was denied the right to present a defense central to identifying the actual cause of J.B.'s death—which should place the burden on the government to prove both a but-for and proximate cause to support his conviction and life sentence.  Although the majority opinion, given our precedent, is the correct one today, it is not the just one.  While a dissent in this case is not in order, a reconsideration of *Webb* is more than ripe.

---

[3] In *Jonas v. City of Atlanta*, appellants brought a Section 1983 claim against the City of Atlanta and Atlanta police officers following their arrests.  The district court charged the jury "that evidence one is attempting to flee may be evidence of guilt." 647 F.2d 580, 586 (5th Cir. Unit B 1981).  We held that the charge, despite containing an accurate statement of law, was not relevant to the defense offered and, therefore, should not have been given.  *Id.*; *see also Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (holding that decisions issued by the Former Fifth Circuit are binding upon this Court).

21-12157                 TJOFLAT, J., Dissenting                 1

TJOFLAT, Circuit Judge, dissenting:

Should a man spend the rest of his life in prison because his drugs were stolen? According to the Majority, Congress would have it no other way, and our hands are tied. I disagree. Because this Court has elevated unadulterated textualism over common sense and longstanding principles of the criminal law, and because we are now treading on dangerous constitutional waters, I respectfully dissent.

## I. INTRODUCTION

It's a timeless adage that "bad facts make bad law." *Haig v. Agee*, 453 U.S. 280, 319 101 S. Ct. 2766, 2788 (1981) (Brennan, J., dissenting). To illustrate my concern with this case, I put forth a more sympathetic defendant.

Take John Doe, a man who developed an unfortunate addiction to pain pills after suffering surgical complications from a knee replacement. A year into his addiction, Mr. Doe receives a Florida conviction for possessing a bottle of unprescribed oxycodone pills.[1] Unable to kick his dependence, he continues purchasing opioids on

---

[1] Possession of an unprescribed controlled substance in Florida is a third-degree felony punishable by up to five years' imprisonment. Fla. Stat. § 893.13(6)(a), § 775.82(3)(e) (2024). It therefore qualifies as a "felony drug offense" under federal law. 21 U.S.C. § 802(44) ("The term 'felony drug offense' means an offense that is punishable by imprisonment for more than one year under any law of the United States or a State or a foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances.").

the black market, storing his contraband in a secured safe by his bedside. He keeps a fair amount of pills in his safe—not boatloads, but, say, more than he might reasonably consume in a month. One night, Mr. Doe's house is burglarized, and the burglars abscond with his safe. They penetrate the safe with an industrial drill and proceed to consume the stolen oxycodone. One burglar overdoses and dies.

Because there is circumstantial evidence that Mr. Doe may have intended to sell some of his pills at a later date, he is charged under 21 U.S.C. § 841 for knowingly possessing a controlled substance with intent to distribute.[2] The Government seeks a sentencing enhancement under § 841(b)(1)(C) because Mr. Doe's drugs resulted in death or serious bodily injury. Resting comfortably on today's Majority opinion, the district court prohibits Mr. Doe from arguing to the jury that his drugs were stolen. The jury is asked only two questions: (1) whether Mr. Doe possessed oxycodone with intent to distribute; and (2) whether that oxycodone was the "but-for cause" of the burglar's death. A simple "yes" to both of

---

[2] Circumstantial evidence can be used to prove possession with intent to distribute. *United States v. Cremades*, 160 F.4th 1296, 1302 (11th Cir. 2025). A jury may infer a defendant's intent to distribute from, among other things, a quantity of drugs that appears inconsistent with personal use. *See, e.g., United States v. Peart*, 888 F.2d 101, 105 n.4 (11th Cir. 1989) ("[A] jury is permitted to infer intent from the quantity and quality of the drugs seized."); *United States v. Perez-Tosta*, 36 F.3d 1552, 1559 (11th Cir. 1994) ("[I]ntent to distribute is inferable from the quantity of cocaine.").

21-12157                 TJOFLAT, J., Dissenting                 3

those questions, and Mr. Doe is going away for life—whether the judge likes it or not.

Congress has long evinced its intent to forcefully curtail the "growing menace of drug abuse in the United States." H.R. Rep. No. 91-1444, at 1 (1970). But this policy directive cannot, and, as I see it, has not given way to basic due process. The straits are not that dire.

## II. POSSESSION & THE RESULTING-IN-DEATH ENHANCEMENT

Subsection (a) of 21 U.S.C. § 841 makes it unlawful for any person to "knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" unless otherwise authorized. 21 U.S.C. § 841(a). Subsection (b) consists of statutory penalty provisions that serve to enhance a defendant's mandatory minimum and maximum sentence based on the nature of his subsection (a) offense. 21 U.S.C. § 841(b).[3]

Most of the § 841(b) sentencing enhancements pertain only to the type and quantity of drug involved. For example, a defendant whose § 841(a) violation involved at least one hundred grams of heroin will receive a five-year mandatory minimum and will see his statutory maximum rise from twenty years to forty years

---

[3] If a defendant is to be sentenced above the otherwise applicable statutory maximum because of a sentencing enhancement, the fact-finding necessary to invoke that sentencing enhancement must be conducted by a jury. *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000).

imprisonment. 21 U.S.C. § 841(b)(1)(B). The sentencing enhancement at issue in this case is a bit different—it introduces a "results" element to the equation. The operative language reads:

> **(b) Penalties**
>
> Except as otherwise provided . . . any person who violates subsection (a) of this section shall be sentenced as follows:
>
> (1) . . . (C) . . . If any person commits such a violation [involving a schedule I or II substance] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of not more than 30 years *and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment* . . . .

21 U.S.C. § 841(b)(1)(C) (emphasis added).

The question here is how the Government ought to establish the "death or serious bodily injury" results-based sentencing enhancement (the "Resulting-in-Death Enhancement"). The Majority takes a simple, mechanistic view. First, it asks whether the defendant has committed any § 841(a) violation. Second, it asks whether a victim's death or serious bodily injury occurred because of (i.e., would not have occurred without) the use of any of the drugs involved in the defendant's § 841(a) violation. If so, the

21-12157                TJOFLAT, J., Dissenting                5

Resulting-in-Death Enhancement applies. No further questions asked.[4]

While admittedly a *plausible* reading, the Majority's approach creates a troubling result. With such a barebones causation standard and total lack of scienter, it allows the Government to avoid proving that the defendant distributed drugs to the decedent or that the defendant even placed the drugs in the chain of distribution in the first place. If a defendant is charged only with possession with intent to distribute, and that charge is paired with the Resulting-in-Death Enhancement, the Government has forged a path to convict an individual whose drugs were stolen from him.

In fact, such an indictment is compatible *only* with this scenario, lest the Government intentionally undercharge a defendant. *See infra* Part II.B. That is, if a defendant never committed actual distribution, then the only other way the drugs could have found their way to the decedent is if they were stolen. As Lebarron astutely notes in his brief on appeal: "On this plane of existence, telekinesis doesn't exist." Appellant's Br. 38. In my view, to treat a larcenist as a victim of the individual from whom he stole is to flip

---

[4] Under the above excerpted portion of § 841(b)(1)(C), which was applied to Lebarron, the Government must also show that the defendant has a "prior conviction for a felony drug offense [that] has become final." 21 U.S.C. § 841(b)(1)(C). Nobody disputes that. But even without a prior conviction, § 841(b)(1)(C) attaches a mandatory minimum twenty year sentence if "death or serious bodily injury results" from a subsection (a) violation. *Id.*

6                      TJOFLAT, J., Dissenting                      21-12157

common sense on its head. I now turn to two other reasons I believe the Majority's approach is misguided.

### A. No Legislative Intent

I heed Justice Frankfurter's warning that "[w]e must be wary against interpolating our notions of policy in the interstices of legislative provisions." *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 11, 62 S. Ct. 875, 880 (1942). Nevertheless, when the "language of a statute is ambiguous or leads to absurd results," it remains squarely within the judicial province to "consult the legislative history and discern the true intent of Congress." *Jones v. Metro. Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1379 (11th Cir. 1982). With this in mind, I would be remiss to not highlight the congressional record, which fails to support the result reached by today's Majority.

In 1970, Congress passed the Controlled Substances Act (the "CSA"), introducing the Nation's first comprehensive scheme of federal drug regulation and enforcement. Pub. L. No. 91-513, Title II, 84 Stat. 1242 (codified as amended at 21 U.S.C. § 801 et seq.). Section 401(a) thereof created the baseline prohibition on dealing in controlled substances that is still used today. *Id.* § 401(a) (codified as amended at 21 U.S.C. § 841(a)). Section 401(b) imposed tiered penalties for violating subsection (a) based on the schedule of drug involved (I–V), and whether the drug was a narcotic or not. *Id.* § 410(b) (codified as amended at 21 U.S.C. § 841(b)).

Sixteen years later, Congress sought to clamp down further on illicit drug use and distribution by passing the Anti-Drug Abuse Act of 1986 (the "ADAA"). Pub. L. No. 99-570, 100 Stat. 3207 (1986)

21-12157                    TJOFLAT, J., Dissenting                    7

(codified as amended at 21 U.S.C. § 801 et seq.). That Act comprised "ten separate bills to attack the proliferating cancer of drug crimes which threaten[ed] to overwhelm this nation's citizens." *United States v. Mosley*, 808 F. Supp. 1572, 1578 (N.D. Ga. 1992). One of those bills, the Narcotics Penalties and Enforcement Act of 1986 (the "NPEA"), overhauled and strengthened the CSA penalty provisions. *See* H.R. 5394, 99th Cong., 2d Sess. (1986); *see also* H.R. Rep. No. 99-845 (1986).

While maintaining schedule-based sentencing, the NPEA introduced more intricate penalty enhancements depending on the specific type and quantity of drugs involved. H.R. 5394. It added mandatory minimum sentences and generally increased statutory maximums. *See id.* Of particular note here, the version of the NPEA that was reported out of committee proposed a standalone provision to enhance penalties for drug offenses that resulted in death or serious bodily injury. *Id.* It provided that such an offense would carry, on top of its regular penalty, a term of imprisonment not less than twenty years.[5] *Id.*

---

[5] Rather than keep this single provision, the final ADAA added two resulting-in-death clauses to each of subparagraphs §§401(b)(1)(A), (B), and (C) of the CSA. ADAA § 1002 (codified as amended at 21 U.S.C. §§841(b)(1)(A), (B), and (C)). Thus, it added six resulting-in-death enhancements with penalties varying based on the type and quantity of drugs involved, and with upgrades for a defendant's prior conviction, if any. *Id.* Each enhancement now includes either a mandatory minimum of twenty years or, with a defendant's qualifying prior conviction, a mandatory minimum of life imprisonment. *Id.* I have found no legislative history explaining the decision to turn away from one unified provision, but importantly, the operative language of "if death or serious bodily

8                    TJOFLAT, J., Dissenting                    21-12157

The report from the House Committee on the Judiciary (the "Committee") made two references to this early version of the Resulting-in-Death Enhancement. Introducing the provision, the Committee explained that it would add "a special term of imprisonment if death or serious bodily injury *results from violating the manufacture or distribution offenses.*" H.R. Rep. 99-845, at 12 (emphasis added). Later, in comparing the pre- and post-NPEA penalty provisions, the Committee wrote that the bill would "create[] a new section 416 of the [CSA] to provide for a special term of imprisonment if death or serious bodily injury *results from violating the manufacturing or distributing offenses* for schedule I, II or III substances." *Id.* at 22 (emphasis added).

The italicized language above is specific: the Committee singled out the crimes of "manufacturing" and "distributing" drugs as the crimes it foresaw being paired with the Resulting-in-Death Enhancement. And it did so each time it brought up the enhancement. Nowhere in the report did the Committee contemplate that the enhancement might apply to drugs that were possessed and later stolen.

The Committee report also identified the bill's two primary objectives:

The Committee strongly believes that the Federal government's most intense focus ought to be on major traffickers, the manufacturers or the heads of

_____

injury results" has remained consistent. *Compare id.* § 1002, *with* 21 U.S.C. §§ 841(b)(1)(A), (B), and (C).

21-12157                TJOFLAT, J., Dissenting                9

> organizations, who are responsible for creating and delivering very large quantities of drugs. . . .
>
> The Committee determined that a second level of focus ought to be on the managers of the retail level traffic, the person who is filling the bags of heroin, packaging crack into vials or wrapping pcp in aluminum foil, and doing so in substantial street quantities. The Committee is calling such traffickers serious traffickers because they keep the street markets going.

*Id.* at 11–12.

These objectives are not furthered by penalizing a defendant for what chaos his drugs may inflict after they are stolen from him. Drugs, after all, can be stolen from lawful or unlawful possessors. It seems to me, in light of the Committee report, that the Resulting-in-Death Enhancement was designed to deter illicit distribution and to hold defendants liable for the consequences of the drugs they send into that chain of illicit distribution. It was not designed to encourage drug safekeeping or to punish those who fall victim to theft.

Tracing back the Resulting-in-Death Enhancement to its inception reveals two final anecdotes. Before being consolidated into the NPEA and further consolidated into the ADAA, the provision was first introduced by Representative Mario Biaggi in H.R. 5103. H.R. Rep. No. 99-845, at 11. Describing his bill, Rep. Biaggi said that it was designed to "establish a maximum penalty of up to life imprisonment if a person *distributes* crack and it results in death." 132 Cong. Rec. E2329 (1986) (emphasis added). A few months later,

Senator Alfonse D'Amato included a similar provision in S. 2787. 132 Cong. Rec. 21964 (1986). He explained that it was intended to add strict penalties for individuals who commit "drug *trafficking* where, as in the recent Len Bias case,[6] death results." *Id.* (emphasis added). These statements confirm that the enhancement's purpose was to punish the intentional production and distribution of drugs. Neither legislator had an eye toward locking up our John Doe for life.

### B. Gaming the Charges

If the Majority is correct, it is difficult to imagine why a prosecutor would ever bother charging a defendant with actual distribution. Assume that a defendant distributes drugs to several people, someone ends up dead, and the death can be traced back to drugs once held by the defendant. If the defendant is charged with the appropriate crime—distribution—and the Government attaches the Resulting-in-Death Enhancement, the defendant could center his defense around the idea that the lethal drugs were stolen from him. And if that argument were believable, a reasonable jury would be unable to find that the defendant's crime of distribution was the "but-for" cause of death.

---

[6] In 1986, Maryland basketball player Len Bias died from a cocaine overdose two days after being drafted by the Boston Celtics. Kaitlin S. Phillips, *From Overdose to Crime Scene: The Incompatibility of Drug-Induced Homicide Statutes with Due Process*, 70 Duke L.J. 659, 672 n.85 (2020). His death became a major instigating force behind the ADAA. *United States v. Peterson*, 143 F. Supp. 2d 569, 573 (E.D. Va. 2001).

21-12157                    TJOFLAT, J., Dissenting                    11

To stave off this defense, the Government is likely to intentionally undercharge a defendant by either (1) only charging him with possession with intent to distribute or, as here, (2) charging him with distribution and possession with intent to distribute, stated in the alternative, and shipping it to the jury that way. Consider Lebarron's jury verdict form on Count Two:

> 1. As to the offense of *distribution **or** possession with the intent to distribute* a mixture or substance containing a detectable amount of fentanyl or methamphetamine, we the Jury, find the defendant JUSTIN CASE LEBARRON,
>
>             GUILTY _____        NOT GUILTY _____
>
> . . .
>
> 3. We, the Jury, having found the defendant JUSTIN CASE LEBARRON, guilty of the offense charged in Count Two, further find with respect to Count Two that J.B.'s use of a mixture or substance containing a detectable amount of fentanyl or methamphetamine, *that the defendant distributed, **or** possessed with an intent to distribute*, was the "but-for" cause of J.B.'s death.
>
>             YES _____             NO _____

Lebarron's Verdict Form, at 2 (emphasis added).

With a mandatory life sentence attaching either way, the Government had no incentive to prove Lebarron's actual distribution beyond a reasonable doubt. Given that the sole purpose of the Resulting-in-Death Enhancement is to punish those who knowingly transmit drugs that end up causing death or serious harm, it

12                    TJOFLAT, J., Dissenting                    21-12157

is strange to create a jurisprudential regime that dissuades the Government from ever proving such a transmission took place.

★          ★          ★

In sum, applying the Resulting-in-Death Enhancement in the case of stolen drugs makes no logical sense, was not contemplated by Congress, does nothing to further the CSA's or NPEA's legislative purpose, and encourages the Government to game the charges so as to foreclose an otherwise salient causation defense.

## III. CAUSATION

As the Supreme Court explained nearly a century ago, it is "a traditional and appropriate function of the courts" to "construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose." *Sorrells v. United States*, 287 U.S. 435, 450, 53 S. Ct. 210, 216 (1932).

Here, the simplest construction to avoid an absurd result—and indeed, the one that appears most consistent with legislative intent—would be to hold that possession with the intent to distribute cannot constitute a predicate § 841(a) violation for purposes of the Resulting-in-Death Enhancement. Unfortunately, as the Majority correctly identifies, such a construction is inconsistent with the plain language of the statute. Section 841(b) applies to "any person who violates subsection (a)" without discriminating as to the disjunctively proscribed conduct therein, including possession with intent to distribute. *See* 21 U.S.C. § 841(b). Perhaps this was a congressional oversight, or perhaps not. But "[e]levating general notions of purpose over the plain meaning of the text is inconsistent with

our judicial duty to interpret the law as written." *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 970 (11th Cir. 2016) (en banc).

The Majority believes this is the end of the matter. I do not. Returning now to the case at hand, Lebarron sought to make the simple argument that he did not distribute drugs to J.B. but that she, in fact, stole them. Lebarron quite sensibly felt that this fact would have some bearing on his legal responsibility for her death. The District Court disagreed, reasoning that "according to the law, if you possess with intent to distribute a controlled substance, even if you didn't actually distribute it . . . because somebody stole it first, you're still guilty." Trial Tr. vol. I, 163. Accordingly, it prohibited him from making the argument to the jury.

I believe the District Court erred. In my view, even if possession with intent to distribute *can* form a predicate § 841(a) offense for the Resulting-in-Death enhancement, the facts and circumstances of an alleged theft are still relevant when we apply traditional principles of causation. By refusing to let Lebarron even make the argument that his drugs were stolen, the District Court sidestepped essential, longstanding due process protections for criminal defendants and therefore abused its discretion.

### A. Proximate Cause

The Resulting-in-Death Enhancement applies only when "death or serious bodily injury *results from* the use of such substance" involved in a defendant's subsection (a) violation. 21 U.S.C. § 841(b)(1)(C) (emphasis added). The two words "results from" signify a causation element. *See United States v. Neadle*, 72 F.3d 1104,

14                      TJOFLAT, J., Dissenting                      21-12157

1115–19 (3d Cir. 1996) (Becker, J., concurring in part and dissenting in part) ("[T]he plain meaning of 'resulted from' connotes causation."). And that causation element invites a variety of plausible interpretations. Specifically, whether the enhancement requires but-for cause, proximate cause, both, or neither is entirely ambiguous.[7] For the reasons discussed *infra*, I believe that, as a matter of basic due process, the Resulting-in-Death Enhancement is best read to include a proximate cause requirement and to allow for an intervening cause defense. But before I begin that argument I offer two important pieces of background information.

First, what exactly is proximate cause, and why does it matter? Generally speaking, "to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." *Paroline v. United States*, 572 U.S. 434, 444, 134 S. Ct. 1710, 1719 (2014). "A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.*

Proximate cause is a ubiquitous feature of both criminal and tort law, and its function is similar in both. *Id.*; *see* Wayne R. LaFave, *Substantive Criminal Law* § 6.4(c) (3d ed. 2017). However, any precise formulation of proximate cause varies with the nature of the crime

---

[7] While our Court and other courts have held otherwise, dissents from the Sixth and Tenth Circuits persuasively make this point. *United States v. Jeffries*, 958 F.3d 517, 524–30 (6th Cir 2020) (Donald, J., dissenting); *United States v. Burkholder*, 816 F.3d 607, 621–28 (10th Cir. 2016) (Briscoe, J., dissenting).

or tort at issue because the inquiry necessarily turns to the connection between the proscribed conduct and the result in question. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201, 137 S. Ct. 1296, 1305 (2017).

As for its importance, consider the following remarks from Professors Prosser and Keeton on proximate cause as a logical imperative:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would set society on edge and fill the courts with endless litigation. As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed. 1984).

Second, I must acknowledge that, in *United States v. Webb*, 655 F.3d 1238 (2011), which binds this panel, our Court squarely rejected a proximate cause requirement for the Resulting-in-Death Enhancement. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point

16                    TJOFLAT, J., Dissenting                    21-12157

of abrogation by the Supreme Court or by this court sitting en banc."). I therefore argue, among other things, that we should reconsider that holding en banc.

⋆          ⋆          ⋆

"Statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534, 113 S. Ct. 1631, 1634 (1993) (alterations adopted) (internal quotation marks omitted) (quoting *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S. Ct. 1011 (1952)). "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S. Ct. 2010, 2015 (1978)).

When interpreting statutes with ambiguous causation requirements, the Supreme Court readily follows this approach, inferring a proximate cause requirement if doing so is consistent with the common law. *See, e.g.*, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346, 125 S. Ct. 1627, 1633 (2005); *Holmes v. Sec. Investor Prot. Corp.*, 504 U.S. 258, 268, 112 S. Ct. 1311, 1318 (1992); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 533, 103 S. Ct. 897, 906 (1983). In the civil arena, the Supreme Court has been clear that Congress need not spell out a proximate cause requirement for one to attach. It instead treats that requirement as a default feature, asking only whether it has been affirmatively *disclaimed* by a statute's plain text.

21-12157                    TJOFLAT, J., Dissenting                    17

Here's what the Court said in *Lexmark International, Inc. v. Static Control Components, Inc.*:

> [W]e generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute. For centuries, it has been "a well established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause." That venerable principle reflects the reality that "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Congress, we assume, is familiar with the common-law rule and does not mean to displace it sub silentio*. We have thus construed federal causes of action in a variety of contexts to incorporate a requirement of proximate causation.

572 U.S. 118, 132, 134 S. Ct. 1377, 1390 (2014) (internal citations omitted) (emphasis added).

In *Lexmark*, the Court proceeded to apply a proximate cause requirement to § 43(a) of the Lanham Act, despite its "broad language" and lack of any statutory command to that effect. *Id.*; *see* 15 U.S.C. § 1125. Our Court has used *Lexmark* to add proximate cause requirements all over the map. In *Watson v. Kingdom of Saudi Arabia*, we read the phrase "physical injury . . . or death . . . caused by . . . a tortious act or acts of the foreign state" in the Justice Against Sponsors of Terrorism Act to encompass proximate cause. 159 F.4th 1234, 1259–60 (11th Cir. 2025); *see* 28 U.S.C. § 1605B(b). In *Ruckh v. Salus Rehabilitation, LLC*, we interpreted the False Claims

Act's prohibition on anyone who "causes [a false or fraudulent claim] to be presented" to require a showing of proximate cause. 963 F.3d 1089, 1107 (11th Cir. 2020).

Notably, in *City of Miami v. Bank of America Corp.*, we applied a proximate cause requirement to claims for damages under the Fair Housing Act ("FHA"). 800 F.3d 1262, 1279 (11th Cir. 2015), *rev'd*, 581 U.S. 189, 137 S. Ct. 1296. The Supreme Court granted certiorari in *City of Miami*, ultimately affirming our decision to infer proximate cause into the FHA but reversing on the grounds that our formulation of proximate cause was *not strict enough*. 581 U.S. at 202, 137 S. Ct. at 1306.

I cannot imagine why we should be more reticent to infer this basic principle of causation in the criminal context. At common law, it is well established that where "crimes [are] so defined as to require not merely conduct but also a specified result of conduct, the defendant's conduct must be the 'legal' or 'proximate' cause of the result." LaFave, *supra* § 6.4. And as the Supreme Court has long directed, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347, 92 S. Ct. 515, 522 (1971) (quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 1059 (1971)). Rejecting proximate cause here does just the opposite: it signals a greater concern for the due process rights of alleged tortfeasors than for those of criminal defendants in the face of the exact same statutory ambiguity. That cannot stand.

21-12157                TJOFLAT, J., Dissenting                19

Perhaps if the crime at hand had no common law analog, or if its common law analog had long disclaimed proximate cause, one could justify the differing treatment. But that's not the case. Section 841(a) paired with the Resulting-in-Death Enhancement is nothing but a codification of felony murder applied to federal drug felonies.[8] And while jurisdictions are split between causation thresholds for felony murder, both approaches require a more robust causal showing than what we apply to § 841(b)(1)(C).

The majority approach to felony murder embraces what is known as "agency" theory. Jennifer DeCook Hatchett, *Kansas Felony Murder: Agency or Proximate Cause?*, 48 U. Kan. L. Rev. 1047, 1051 (2000). In jurisdictions following agency theory, a felon is only responsible for his own actions or the actions of his co-felon(s), whom the law deems to be his agent. *Id.*; *see Moore v. Wyrick*, 766 F.2d 1253, 1255–56 (8th Cir. 1985). It goes without saying that a thief is not the agent of the person he steals from, so this approach would exonerate Lebarron, assuming arguendo that his drugs were truly stolen.

The minority approach, known as "proximate cause" theory, is more prosecution-friendly, attaching liability for "any death proximately resulting from [a defendant's] unlawful activity," which

---

[8] The fact that the statute doesn't reclassify the crime as "murder" can hardly be used to defeat this analogy, as the punishment (often life imprisonment) surely fits the crime of murder. States which have adopted similar laws almost invariably did so by adding a category to their felony murder statute or adding a new provision classified as homicide. *See*, *e.g.*, Fla. Stat. § 782.04(1)(a)(3); Tenn. Code § 39-13-210 (2026); 720 Ill. Comp. Stat. 5/9-3.3 (2025).

20                    TJOFLAT, J., Dissenting                    21-12157

may include the death of a co-felon at the hand of someone resisting the crime. Hatchett, *supra*, at 1051; *see Moore*, 766 F.2d at 1256. While often criticized for its overbreadth,[9] the proximate cause theory, evident from its name, retains the basic protection of proximate causation to ensure that a defendant is convicted only if a death was the "natural and probable consequence" of his conduct. LaFave, *supra* § 14.5(d); *accord Lewis v. State*, 474 So. 2d 766, 771 (Ala. Crim. App. 1985). Under this approach, the jury would at least have the chance to consider whether J.B.'s death was, in light of the alleged theft, proximate enough to Lebarron's drug offense so as to impose liability on Lebarron.[10]

⋆         ⋆         ⋆

In 2011, this Court heard the appeal of David W. Webb, an ex-Florida physician who was convicted by a jury on 130 counts of a 131-count indictment. *Webb*, 655 F.3d at 1240. Webb was charged with, among other things, unlawfully dispensing oxycodone and fentanyl resulting in the deaths of two patients.[11] *Id.* at 1248. At trial, the jury received the following instruction:

---

[9] Perhaps the most controversial application of proximate cause theory occurs when a defendant faces liability for a police officer's shooting of the defendant's co-felon. *See, e.g.*, *Dickens v. State*, 2005 OK CR 4, ¶ 5.

[10] This is exactly the approach followed by Illinois, which imported its felony murder proximate cause requirement onto its drug-induced homicide statute. *People v. Boand*, 362 Ill. App. 3d 106, 143, 838 N.E.2d 367, 401 (2005).

[11] The Government alleged that Webb prescribed controlled medications in quantities and frequencies well above medical guidelines and without regard to clear signs of abuse by his patients. *Webb*, 655 F.3d at 1241–45. One

21-12157                TJOFLAT, J., Dissenting                21

> There is no requirement that the death resulting from the use of the controlled substance dispensed was a reasonably foreseeable event, or that the controlled substance was the proximate cause of the death. This standard is satisfied upon a finding by you that, but for the victims' ingesting the controlled substances charged in the indictment, the victims would not have died.

*Id.*

Webb appealed, arguing that the jury should have been required to find proximate cause. *Id.* We affirmed. Joining a chorus of other circuits, we held that § 841(b)(1)(C)'s Resulting-in-Death Enhancement unambiguously "*does not* require that the defendant's conduct proximately cause . . . death" or serious bodily injury. *Id.* (emphasis added). Instead, we decided that the statute only imposes a "cause-in-fact" requirement, satisfied by a jury finding that "but for the victims' ingesting the controlled substances charged in the indictment, the victims would not have died." *Id.*

In reaching this conclusion, we relied heavily on decisions from other circuits, dedicating a mere two paragraphs to our own analysis of the issue. *Id.* at 1254–55. And each of those opinions we cited in *Webb* relied heavily on the earlier decisions of other circuits, resulting in something of a snowball effect toward inter-circuit

---

physician testified that Webb's prescribing practices were "dangerous, absolutely incredible, and clearly inconsistent with the usual course of medical practice." *Id.* at 1242.

22                    TJOFLAT, J., Dissenting                    21-12157

consensus. *See United States v. Patterson*, 38 F.3d 139 (4th Cir. 1994); *United States v. Robinson*, 167 F.3d 824, 830 (3d Cir. 1999) (citing *Patterson*); *United States v. McIntosh*, 236 F.3d 968, 972 (8th Cir. 2001) (citing *Patterson* and *Robinson*); *United States v. Houston*, 406 F.3d 1121, 1124 (9th Cir. 2005) (citing *Patterson*, *Robinson*, and *McIntosh*); *United States v. De La Cruz*, 514 F.3d 121, 137 (1st Cir. 2008) (citing *Patterson*, *Robinson*, *McIntosh*, and *Houston*); *Webb*, 655 F.3d at 1250–54 (citing *Patterson*, *Robinson*, *McIntosh*, *Houston*, and *De La Cruz*).

I point this out not to chide the notion that we can and should explore other circuit opinions for persuasive value. But I am concerned that, as here, it can create a false sense of confidence in a less-than-ironclad position. The Fourth Circuit was the first to decide the issue, yet it offered little more than the text of § 841(b)(1)(C) and a statement that it would "not second-guess [Congress'] unequivocal choice" to "enhance a defendant's sentence regardless of whether the defendant knew or should have known that death would result." *Patterson*, 38 F.3d at 145. Building on this paltry analysis, a pattern emerged: case by case, each circuit would offer a few sentences of textual interpretation followed by a statement that the court agreed with the position of its sister courts. I repeat the prescient observation of a colleague: "Although the cases look impressive as a whole, a cursory inspection of each case reveals that they stand on uneasy footing and should not be

21-12157                TJOFLAT, J., Dissenting                23

given . . . persuasive value." *Jeffries*, 958 F.3d at 528 (Donald, J., dissenting).[12]

I believe *Webb* was wrong from the start, but subsequent developments in the law provide all the more reason to reconsider that opinion. In 2013, two years after *Webb*, the Supreme Court granted certiorari on two questions about the Resulting-in-Death Enhancement: (1) whether it requires a jury finding of but-for causation; and (2) whether it requires a jury finding of proximate causation. *Burrage v. United States*, 571 U.S. 204, 208, 134 S. Ct. 881, 886 (2014). The Court did not answer the latter question, instead

---

[12] One particular point, often raised in these cases, flies off the page as problematic. Consider this statement from the Sixth Circuit:

> It is always foreseeable that a violation of § 841(a)(1) will involve an ultimate user of the substance and that death or injury may result from that use. Because death or injury from the use of the substance is inherently foreseeable, there is no need to require the government to prove that they were reasonably foreseeable to the defendant. It therefore makes sense to require the government to prove only but-for causation in order to apply the enhanced penalty.

*Jeffries*, 958 F.3d at 524.

I am unfamiliar with the canon of construction that suggests we set aside basic due process protections for criminal defendants because a court is unable to contemplate where they might apply. It may be that *most* deaths traceable to a § 841(a) manufacture or distribution violation will be foreseeable. But it is hardly difficult to conjure up a hypothetical to the contrary. *See supra* Part I; *infra* note 14. This is especially true when the enhancement is predicated on a charge of possession with intent to distribute rather than actual distribution.

setting aside the petitioner's conviction by holding that the statute required but-for causation, which the Government admittedly could not show. *Burrage*, 571 U.S. at 219, 134 S. Ct. at 892. But the Court's prefatory analysis cannot be overlooked. It explained:

> The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and *legal cause*. When a crime requires "not merely conduct but also a specified result of conduct," a defendant generally may not be convicted unless his conduct is "*both* (1) the actual cause, and (2) *the 'legal' cause (often called the 'proximate cause')* of the result."

*Id.* at 210, 134 S. Ct. at 887 (emphasis added) (internal citation omitted) (quoting Wayne R. LaFave, *Substantive Criminal Law* § 6.4 (2d ed. 2003)).

Just as the Court has tackled questions of causation in the civil context, *see supra* Part III.A.1., in *Burrage*, it immediately went to the common law for guidance. It explained that Congress legislates against a backdrop of "traditional background principles" and that the rule of lenity barred it from ignoring the statute's ordinary meaning in a way that disfavored the defendant. *Burrage*, 571 U.S. at 214, 216, 134 S. Ct. at 890–91 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347, 133 S. Ct. 2517, 2525 (2013)).

The Court then turned to the Model Penal Code (the "MPC") for, among other things, a reminder that but-for causation is "*the minimum requirement* for a finding of causation when a crime is defined in terms of conduct causing a particular result." *Id.* at 211, 134 S. Ct. at 888 (emphasis in original) (quoting Model

21-12157                TJOFLAT, J., Dissenting                25

Penal Code § 2.03, Explanatory Note (A.L.I., Proposed Official Draft 1962)). And, while the Court had no need to expound upon it, that very section of the MPC also speaks to proximate cause. Namely, it refuses to hold a defendant guilty for a particular result unless: (1) the result was proximately caused by the defendant's actions; or (2) the result requires a finding of scienter. Model Penal Code § 2.03. In sum, while *Burrage* did not decide the proximate cause question, the Court provided instructive guidance and foreshadowed how it might approach it in the future.[13]

And that's not all. Just a few months later, the Court doubled down on its common-law approach to causation in *Paroline*. 572

---

[13] Sixth Circuit Judge Donald, writing in dissent, offered the following discussion on the Supreme Court's decision to grant certiorari in *Burrage*:

> If every circuit agreed on the proximate cause issue, then why would the court grant certiorari? No circuit split existed on the proximate cause issue. . . . Maybe, four justices believed that a United States court of appeals had so far departed from the accepted and usual course of judicial proceedings, as to call for an exercise of this Court's supervisory power. Maybe, four justices believed this issue is an important question of federal law that has not been, but should be, settled by the Supreme Court. No matter the answer, the grant of certiorari certainly suggests that four justices had some questions about whether proof of proximate cause is required under § 841(b)(1)(C)'s [Resulting-in-Death Enhancement]. If the language were unambiguous as the majority and the other circuits find, then the Supreme Court would have had little to no reason to grant certiorari and ask the question.

*Jeffries*, 958 F.3d at 526 (Donald, J., dissenting) (alterations adopted) (citation and internal quotation marks omitted).

26                    TJOFLAT, J., Dissenting                    21-12157

U.S. 434, 134 S. Ct. 1710. There, the Court resolved a circuit split about the "proper causation inquiry" to establish whether and to what extent a criminal defendant found guilty of possessing child pornography is liable for restitution. *Id.* at 443, 134 S. Ct. at 1718. The relevant statute mandated restitution for certain categories of expenses (e.g., medical services, psychological care, etc.) and included a catchall provision to cover "any other losses suffered by a victim as a proximate result of the offense." 18 U.S.C. § 2259(b)(3) (2014). The Court held that the proximate cause requirement applied not only to the catchall provision, but also to the specific categories preceding it. *Paroline*, 572 U.S. at 448, 134 S. Ct. at 1722. Along the way, it offered the following remarks:

> Even if [the statute] made no express reference to proximate causation, the Court might well hold that a showing of proximate cause was required. Proximate cause is a standard aspect of causation in criminal law and the law of torts. Given proximate cause's traditional role in causation analysis, this Court has more than once found a proximate-cause requirement built into a statute that did not expressly impose one.

*Id.* at 446, 134 S. Ct. at 1720 (internal citations omitted).

To be clear, I do not suggest that either *Burrage* or *Paroline* abrogates our decision in *Webb*. *See United States v. Dubois*, 139 F.4th 887, 892 (11th Cir. 2025) ("An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both 'clearly on point' and 'clearly contrary to' our earlier decision."

21-12157          TJOFLAT, J., Dissenting          27

(quoting *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 743 (11th Cir. 2024))). But those decisions should give us pause. "[D]icta from the Supreme Court is not something to be lightly cast aside." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997); *see also Schwab v. Crosby*, 451 F.3d 1308, 1325 ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta."). "[W]ith inferior courts, like ourselves, . . . carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004). Just as important, we can independently arrive at the result suggested by this dicta by simply following the Court's holdings on causation and its approach to statutory language invoking common law principles.

⋆          ⋆          ⋆

To recap, our holding in *Webb* thwarts legislative intent, erroneously concludes § 841(b)(1)(C) is unambiguous, ignores longstanding common law and due process protections, sits uneasily alongside civil cases where we readily inferred a proximate cause requirement, and may likely be overruled by the Supreme Court. This has, unsurprisingly, made way for absurd results.[14] I therefore urge this Court to reconsider that decision.

---

[14] The absurd results do not end with the enhancement's application to stolen drugs. Imagine a defendant shares synthetic THC (schedule I) with a friend, and the friend consumes a normal dosage under the defendant's supervision. The drug causes the friend to get hungry, and he unwittingly eats a cookie cross contaminated with peanuts. Deathly allergic to peanuts, the friend enters anaphylactic shock and later dies. Without a proximate cause requirement,

28                          TJOFLAT, J., Dissenting                    21-12157

### B. Intervening/Superseding Cause

*Webb* notwithstanding, were I in the majority, I would remand this case for a new trial on the grounds that Lebarron should have been allowed to argue that the chain of causation leading to J.B.'s death was severed by an "intervening cause," such as J.B.'s alleged independent decision to steal the drugs from Lebarron.[15]

An intervening cause is "[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." *Intervening Cause*, *Black's Law Dictionary* (12th ed. 2024). Where that cause is "strong enough to relieve the

---

the defendant can be convicted of distribution plus the Resulting-in-Death Enhancement because the friend would not have died but for his ingestion of the controlled substance.

[15] With due credit to the District Court, it very much considered this issue, informing Lebarron before trial:

> The Eleventh Circuit tells us, we have never decided whether there is an intervening cause exception to the death-result sentence enhancement. . . . So in my opinion, the issue we're talking about right now is a very live issue, because they have never decided it. I'm ruling against you. Okay. I may be totally wrong. You get an opportunity, I think, if I'm right about this, to take this to the circuit court of appeals, and maybe they'll answer it. I hope they do. And I hope someone is reading this transcript, because we have a heck of a lot of these fentanyl cases here, and we would like to have some clarity in the law on this.

Trial Tr. vol. II, 19–20.

21-12157                TJOFLAT, J., Dissenting                29

wrongdoer of liability," it is often referred to as a "superseding cause." *Id.* What separates a nonexculpatory intervening cause from a superseding cause is fact-dependent under the common law, but it often turns on foreseeability and the degree to which the defendant's conduct made the intervening cause more likely. *See* LaFave, *supra*, § 6.4(f); Restatement (Second) of Torts § 442 (A.L.I. 1977); *State v. Campfield*, 213 N.J. 218, 234 (2013) ("[T]he factfinder must consider whether holding the defendant criminally responsible for the result would be unjust, given the remoteness of the relationship between the defendant's act and the harm to the victim, accidental intervening causes or the volitional acts of others.").

For example, in *J.A.C. v. State*, the Florida District Court of Appeals reversed a drag race driver's conviction for vehicular homicide of his passenger, finding that "[t]he accident only occurred because the decedent, while attempting to operate the gear shift, grabbed the steering wheel and caused the vehicle to go out of control." 374 So. 2d 606, 607 (Fla. Dist. Ct. App. 1979). The court reasoned that the defendant's reckless driving, while still the but-for cause of the passenger's death, "was superseded by the decedent's own independent intervening act." *Id.*; *see also Robinson v. Howard Bros. of Jackson*, 372 So. 2d 1074, 1075–76 (Miss. 1979) (holding that an underage gun-purchaser's intentional decision to murder his girlfriend superseded the defendant gun store's unlawful act of selling a gun to a minor in the chain of events leading to the girlfriend's death).

Would a decedent's independent decision to steal a defendant's drugs qualify as a superseding cause under § 841(b)(1)(C)? I argue that, at least in most cases, it would. The law tends to look quite skeptically at intervening causes that are *intentional* acts, especially criminal acts, of third parties or victims.[16] *See* 1 *Wharton's Criminal Law* § 6:3 (16th ed.) ("A subsequent actor's intentional action will usually break the chain of causation"); *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. Unit B June 1981) ("Where the intervening act is a criminal act of a third party, and because a person usually has no reason to foresee the criminal acts of another, the criminal act generally breaks the chain of causation[.]");[17] *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980) (explaining that "the extraordinary nature" of intervening criminal conduct necessitates an especially close relationship between the defendant's action and the harm); Keeton et al., *supra*, § 33, at 201 ("Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, [an individual] may reasonably proceed upon the assumption that others will obey the criminal law."). And rightly so. "Guilt under our system of government is personal. When we make guilt

---

[16] I am, of course, referring only to cases where the defendant has no conspiratorial relationship with the third party. *See generally Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180 (1946) (holding that a conspirator may be convicted of a crime committed by a co-conspirator in furtherance of the conspiracy sans direct participation or specific knowledge of the crime).

[17] This Court has adopted as binding precedent all decisions of the Fifth Circuit issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

21-12157                    TJOFLAT, J., Dissenting                    31

vicarious we borrow from systems alien to ours and ape our ene-mies." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 179, 71 S. Ct. 624, 652 (1951) (Douglas, J., concurring).

To be sure, an intentional intervening act, even when crimi-nal, is not *always* enough to set aside liability.[18] The Second Restate-ment of Torts still recommends liability when "at the time of his negligent conduct[, the defendant] realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit . . . a tort or crime." § 448. It offers the following illustration:

> The A Railroad Company negligently runs down a truck driven by a servant of B and containing barrels of cider. The collision occurs at night and at a place where there have been frequent thefts from the com-pany's freight cars. It results in the scattering of the barrels of cider along the road and the stunning of the driver. The cider is stolen by unknown thieves. The negligence of the A Railroad Company is a legal cause of the loss of the cider by the theft of the unknown persons.

*Id.* § 448 Illustration 1.

But there are reasons this exception might not apply here. Unlike in tort law, where the calculus requires us to decide who (the

---

[18] For example, a decedent's independent decision to ingest controlled sub-stances that were intentionally distributed to him by the defendant would, on its own, not constitute a superseding cause under § 841(b)(1)(C). To hold oth-erwise would surely frustrate the will of Congress.

32                    TJOFLAT, J., Dissenting                    21-12157

victim or the tortfeasor) should endure an ineluctable financial injury, the question in criminal law is who, if anyone, ought to be criminally punished for causing a particular result. *See* LaFave, *supra* § 6.4(c) ("[W]ith crimes, where the consequences of a determination of guilt are more drastic . . . it is arguable that a closer relationship between the result achieved and that intended or hazarded should be required."). Moreover, unlike in tort law where proximate causation often serves to eliminate a defendant's total liability, causation in criminal law more often determines the degree of punishment rather than absolute guilt or innocence. *Id.*

I offer no opinion on whether Lebarron's drugs were actually stolen or whether that alleged theft rose to the level of a superseding cause in J.B.'s death. We are not factfinders nor are we a Court of first review. *See Brookins v. The Round Table, Inc.*, 624 S.W.2d 547, 550 (Tenn. 1981) ("[I]ssues of proximate cause [and] intervening cause . . . are peculiarly issues for the trier of fact, not the court to determine."). But I adamantly believe that Lebarron should have been allowed to make that case to the jury. And I cannot in good conscience chalk this up as harmless error.

⋆          ⋆          ⋆

One final note on *Webb*. The Government decries Lebarron's argument about an intervening cause defense as a "repackaged . . . foreseeability (and proximate cause) argument that this Court rejected in *Webb*." Appellee's Br. at 31–32. I disagree. The proximate cause and intervening cause analyses are more than two sides of the same coin. There are plenty of things that could break the chain

21-12157    TJOFLAT, J., Dissenting    33

of proximate causation that would not be framed as intervening causes. And while some courts describe an intervening cause as something that can sever proximate causation, *see e.g.*, *J.A.C.*, 374 So. 2d at 607, other courts frame it in terms of cause in fact. *See*, *e.g.*, *State v. Frahm*, 193 Wash. 2d 590, 601 (2019) ("Whether an intervening act rises to the level of a superseding cause is an issue of actual cause."); *Pearson v. State*, 601 So. 2d 1119, 1126 (Ala. Crim. App. 1992) ("The accused's conduct is not the cause-in-fact of an injury if there was an unforeseen supervening, intervening cause sufficient to break the chain of causation." (internal quotation marks omitted)).

Most importantly, *Webb* simply did not reach the issue. There, the appellant offered no plausible intervening cause between his unlawful prescriptions and the decedents' overdoses. *See Webb*, 655 F.3d at 1241–48. And our Court's narrow holding was that the district court did not err by excluding a proximate cause instruction.[19] *Id.* at 1255. We have, on several occasions, expressly left open the question of an intervening cause defense, including in an unpublished opinion released after *Webb*. *United States v.*

---

[19] Specifically, *Webb* held that the Government did not have to prove foreseeability as an element of its case. *Id.* at 1254–55. Webb neither requested an affirmative intervening cause defense, nor did the Court opine on whether one existed. *Id.* at 1248, 1255. It is a common understanding that affirmative defenses often stand to defeat liability even when they do not serve to undermine a particular element of the prosecution's case. LaFave, *supra* § 1.8(c). Thus, whether an intervening cause tends to negate proximate cause more than but-for cause is inapposite to the question of whether an affirmative defense exists.

*Rodriguez*, 279 F.3d 947, 951, n.5 (11th Cir. 2002); *United States v. Muller*, 819 F. App'x 701, 711, n.5 (11th Cir. 2020). Accordingly, I do not believe this path was foreclosed until today.

## IV. CONCLUSION

This Court, through a series of erroneous decisions, has cultivated a landscape where a defendant can be de facto charged with murder and face life in prison because of a death that is only connected to his conduct by mere happenstance. I would remand this case for a new trial, where Lebarron would have the opportunity to argue that theft was a superseding cause of J.B.'s death. Additionally, I believe we should revisit our holding in *Webb*, and I implore Lebarron to seek rehearing en banc.[20]

For the foregoing reasons, I respectfully dissent.

---

[20] Lebarron, joined by amici curiae, further argues that the Resulting-in-Death Enhancement is best read to require some proof of mens rea as to the resulting death. I tend to agree. The Supreme Court has made clear that courts should presume mens rea applies to elements that serve to separate criminal conduct from innocent conduct. *Staples v. United States*, 511 U.S. 600, 618, 114 S. Ct. 1793, 1804 (1994). There exists considerable debate, however, as to whether courts should also presume mens rea applies to elements that determine severity, rather than total innocence. *Compare United States v. Collazo*, 984 F.3d 1308, 1325 (9th Cir. 2021) (en banc) ("[A]bsent statutory language suggesting otherwise, the scienter presumption does not apply to elements that do not separate innocent from wrongful conduct."), *with United States v. Burwell*, 690 F.3d 500, 543 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (explaining that "it would be incoherent to limit the presumption of mens rea to only those cases where it's necessary to avoid criminalizing what the defendant thought was

21-12157                    TJOFLAT, J., Dissenting                    35

innocent conduct" and that the "Supreme Court has never drawn such a distinction").

        While I focus my dissent on causation, I believe that some level of mens rea, perhaps criminal negligence, is appropriate to ensure adequate culpability and to justify the dramatic increase in penalty brought about by the Resulting-in-Death Enhancement. *See Burwell*, 609 F.3d at 543–44 (Kavanaugh, J., dissenting) (explaining that it "would make no sense at all" to presume mens rea for an element of a crime which increases punishment from zero time in prison to two years but not to presume mens rea for an element which increases punishment from ten years to thirty years). As it stands today, a defendant can go from no mandatory minimum sentence to a mandatory minimum of life in prison without any finding of escalated guilt. This flouts our "universal and persistent" common law tradition "that an injury can amount to a crime only when inflicted by intention" and a "vicious will." *Morissette v. United States*, 342 U.S. 246, 250–52, 72 S. Ct. 240, 243–44 (1952) (quoting 4 William Blackstone, Commentaries on the Laws of England 21 (1769)).